# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:12-23569-Civ - MIDDLEBROOKS/BRANNON

WI-LAN USA, INC. and WI-LAN INC.,

        Plaintiffs

vs.

TELEFONAKTIEBOLAGET LM
ERICSSON and ERICSSON INC.,

        Defendants.

_____/

## DECLARATION OF CHRIS DUNSTAN

I, Chris Dunstan, hereby declare as follows:

1.      I am a Legal Counsel - Litigation for defendant, Ericsson, Inc.

2.      All the facts set forth in this Declaration are true and correct, based upon my personal knowledge or upon my investigation on behalf of Telefonaktiebolaget LM Ericsson ("LME") and Ericsson, Inc.  I submit this Declaration in support of the Defendants' Motion for Summary Judgment.

3.      LME is a Swedish corporation which, through its subsidiaries, is in the business of providing telecommunication and data-communication systems and related services.

4.      LME is the ultimate parent company of Ericsson Inc.,[1] which oversees LME's business in the United States.  Ericsson Inc.'s core products are antennas, transmitters, switching systems and other equipment used to build wireless telecommunications networks, and includes products compliant with UMTS and 3GPP standards.

---

[1] LME and Ericsson, Inc. will be referred to collectively in this Declaration as "Ericsson."

5.     The Universal Mobile Telecommunications System ("UMTS") is one of the so-called "third-generation," or "3G," mobile cellular communication systems.  A network based on the UMTS standard has three main components: (i) user equipment; (ii) a UMTS Terrestrial Radio Access Network; and (iii) a Core Network.  High Speed Packet Access ("HSPA") is a technology that relates to the transfer of data between the Radio Access Network and user equipment in a UMTS system.

6.     The 3rd Generation Partnership Project ("3GPP") is a consortium of regional telecommunications associations that was established to develop a global standard for providing a wide range of mobile services, such as telephony, paging, messaging, Internet and broadband data.  The 3GPP has released a UMTS standard that provides detailed specifications for many of the component elements of a UMTS system.  The 3GPP updates its UMTS standard in "Releases."  Each Release includes hundreds of individual documents, which are grouped into numbered sets of internally consistent specifications known as "Series."  Releases 5, 6 and 7 all fall within the 21-35 series of the 3GPP standard.

7.     On October 5, 2010, Wi-LAN filed a lawsuit against Ericsson in the United States District Court for the Eastern District of Texas (the "Texas Lawsuit") alleging infringement of U.S. Patent Nos. 6,088,326, 6,195,327, 6,222,819 and 6,381,211 (collectively, the "HSPA Lawsuit Patents").  A true and accurate copy of the complaint filed by Wi-LAN in the Texas Lawsuit is attached hereto as Exhibit A.  Because the products accused in the Texas Lawsuit support Releases 5, 6 and 7 of the 3GPP standard, and those releases fall with the 3GPP's 21-35 series, those accused products meet the definition of UMTS/HSPA PRODUCTS, as defined in the Agreement.

8.     On January 19, 2011, Wi-LAN, through counsel, sent correspondence to counsel for Ericsson setting forth Wi-LAN's position that the HSPA Lawsuit Patents fall outside the scope of the Agreement for purposes of the Texas Lawsuit because they are not listed in Schedule A to that agreement.  A true and accurate copy of this January 19, 2011 correspondence is attached hereto as Exhibit B.

9.     On May 23, 2011, Ericsson, through counsel, placed Wi-LAN on notice that LME was invoking its rights under the Agreement to receive, on its behalf and on behalf of its affiliates, a license on the same terms as Wi-LAN's most-favored licensee.  In the same correspondence, Ericsson also requested further information regarding the patent licenses that had been granted by Wi-LAN to third parties.  A true and accurate copy of this May 23, 2011 correspondence is attached hereto as Exhibit C.  Wi-LAN did not respond to LME's May 23, 2011 correspondence.

10.     At the time of its May 23, 2011 correspondence to Wi-LAN, Ericsson was unaware that Wi-LAN had entered into a "Patent License Agreement" with BelAir Networks, Inc. ("BelAir") dated December 30, 2009 (the "BelAir License").  A true and accurate copy of the BelAir License is attached hereto as Exhibit D.

11.     On November 8, 2012, subsequent to its discovery of the BelAir License, Ericsson, through counsel, sent a second letter to Wi-LAN demanding to receive, on its behalf and on behalf of its affiliates, a license containing the same terms as the BelAir License.  A true and accurate copy of this November 8, 2012 correspondence is attached hereto as Exhibit E.

12.     On February 1, 2013, Ericsson, through counsel, sent a third letter to Wi-LAN reiterating LME's demand Agreement to receive, on its behalf and on behalf of its affiliates, a

license containing the same terms as the BelAir License.  A true and accurate copy of this February 1, 2013 correspondence is attached hereto as Exhibit F.

13.    To date, Wi-LAN has failed and refused to grant LME a license on terms that are, at minimum, identical to those in the BelAir License.

14.    Notwithstanding the fact that the Wi-LAN patents involved in this litigation are not valid and not infringed, for the avoidance of costs associated with this litigation, Ericsson is prepared to: (1) accept the terms of the BelAir License as the most-favored license to which it is entitled under the terms of the Agreement; and (2) tender the payment of $300,000 Canadian dollars required by Section 3.1 of the BelAir License.

I declare under penalty of perjury under the laws of the United States pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 13th day of February, 2013.

Chris Dunstan

# Exhibit C

# THOMPSON & KNIGHT LLP

ATTORNEYS AND COUNSELORS

ONE ARTS PLAZA
1722 ROUTH STREET • SUITE 1500
DALLAS, TEXAS 75201-2533
(214) 969-1700
FAX (214) 969-1751
www.tklaw.com

RICHARD L. WYNNE, JR.
(214) 969-1386
richard.wynne@tklaw.com

AUSTIN
DALLAS
DETROIT
FORT WORTH
HOUSTON
NEW YORK

ALGIERS
LONDON
MEXICO CITY
MONTERREY
PARIS

May 23, 2011

David B. Weaver
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746–7568

<u>VIA E-MAIL</u>

Re:   *Wi–LAN v. Alcatel–Lucent et al.*, Case No. 6 :10–CV–521 (E.D. Tex.)

Dear Mr. Weaver:

As you recall from our previous correspondence, Telefonaktiebolaget LM Ericsson ("LME") has entered into a binding Patent and Conflict Resolution Agreement ("CRA") with Wi–LAN. As we have explained in detail, the current lawsuit is in violation of the terms of the CRA.

Without waiving its contract claims against Wi–LAN, LME hereby invokes its rights under Article VII of the CRA. According to that article, Wi–LAN has agreed to offer, at the request of LME, "a non-exclusive license to make, have made, use, sell, offer for sale, lease or otherwise dispose of, and import LME PRODUCTS including UMTS/HSPA PRODUCTS and Wi–LAN agrees to grant such a license at most-favored licensee status as compared to any future licensee of Wi–LAN." LME requests under the CRA that Wi–LAN provide the details of such a license for the LME Products at issue in this litigation.

Under Article VII, Section 3, the relevant factors to be considered in determining whether the rate being offered is a most-favored-licensee rate include "all relevant factors including, but not limited to, nature of license, notice of infringement, volume of sales, types of sales and patent coverage." Because the most-favored-licensee provision relates to all agreements entered into after the effective date of the CRA, please also include the rates that other companies have paid since the effective date of the CRA, including the scope and nature of the license. the products accused of infringement and their sales, and any discounts for parts licensed under other Wi–LAN patents.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Richard L. Wynne, Jr.

RLW:ls

# Exhibit D

WI-LAN INC.
PATENT LICENSE AGREEMENT

THIS PATENT LICENSE AGREEMENT is made as of December 30, 2009 (the "Effective Date") by and between Wi-LAN Inc., a corporation existing under the laws of Canada ("Wi-LAN") and BelAir Networks Inc., a corporation existing under the laws of Canada (the "Licensee" and, together with Wi-LAN, each, a "Party").

WHEREAS capitalized terms that are used but not defined in this Agreement have the meanings ascribed thereto in Schedule "A" to this Agreement; and

WHEREAS the Licensee is willing to make royalty payments to Wi-LAN in connection with the Subject Products as more fully set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the parties hereto covenant and agree as follows:

ARTICLE I
GRANT OF LICENSE / RELEASE

1.1     License. Subject to the terms of this Agreement, Wi-LAN hereby grants to the Licensee and its Subsidiaries during the Term, non-exclusive, non-assignable (except as provided in Article V hereof), world-wide, irrevocable (to the extent allowed hereunder) licenses under the Licensed Patents to make, have made, import, use, lease, offer for sale, sell, transfer and/or otherwise dispose of Subject Products, in each case with no right to grant sublicenses. Notwithstanding the foregoing prohibition against sublicensing of the Licensed Patents, the Licensee and its Subsidiaries shall be entitled under the Licensed Patents to sublicense the use of any patented inventions claimed in the Licensed Patents for the purposes of Subject Products.

1.2     Have Made Rights. The licenses granted in Section 1.1 hereof include a right for the Licensee and its Subsidiaries to have Subject Products made by third parties. For greater certainty, any Person that produces or manufactures Subject Products on behalf of the Licensee and its Subsidiaries shall be immune from suit to the extent that such Person manufactures or produces such Subject Products for use, importation, offer for sale, lease, sale and/or other transfer by the Licensee and/or its Subsidiaries.

1.3     Anti-Laundering. The Parties understand and acknowledge that the licenses and releases granted by Wi-LAN hereunder are intended to cover the activities of the Licensee and its Subsidiaries only and, without limiting the generality of the foregoing, are not intended to cover manufacturing activities that the Licensee and/or any of its Subsidiaries may undertake on behalf of any third party based on any design owned or submitted by any such third party. The Parties further agree that any purchase of a product from a third party and resale of such product in substantially the same form to the same third party or to any Subsidiary of that third party (i.e. "patent laundering" activities) is not licensed under this Agreement. For greater certainty, Wi-LAN acknowledges and agrees that the foregoing limitation is not intended to prevent the Licensee and its Subsidiaries from re-selling, re-distributing and otherwise disposing of third-party products and third-party components and all of the licenses and releases granted in this Agreement shall apply to such third-party products and third-party components, provided that any such re-sale, re-distribution or other disposition by the Licensee or its Subsidiaries is not to the same third party (or any of its Subsidiaries) from whom such third-party products or third-party components were acquired.

1.4     Release. Subject to the provisions of Section 2.1 hereof, but without limiting the obligations of the Parties hereunder, Wi-LAN on behalf of itself and its Subsidiaries (collectively, the "Releasors"),

hereby releases, acquits and forever discharges the Licensee and the Licensee's Subsidiaries and their respective direct and indirect customers, purchasers, Channel Partners and outsourced providers from any and all past or present claims or liability for infringement (direct, induced, indirect or contributory), demands, actions, causes of action (whether known or unknown), suits of any kind or nature (including all equitable remedies), rights, damages, costs, losses, expenses and compensation with respect to any Licensed Patents relating to any Subject Products arising prior to the Effective Date, but only to the extent any such infringement would have been licensed under the licenses granted to the Licensee hereunder if such licenses had been in existence at the time of such infringing activity.

ARTICLE II

ROYALTIES, PAYMENTS AND TAXES

2.1    Royalties.  As consideration for the licenses and releases granted in Sections 1.1 and 1.3 hereof and subject to the provisions hereof, the Licensee shall pay CDN$300,000 (the "Royalty") to Wi-LAN by way of the payment of CDN$37,500 on or before each of December 31, 2009, February 28, 2010, May 31, 2010, August 31, 2010, November 30, 2010, February 28, 2011, May 31, 2011 and August 31, 2011, each such payment to be made by way of electronic funds transfer to the following account or to such other account as the Licensee may be directed by Wi-LAN in writing:

| | |
|---|---|
| Bank: | Royal Bank of Canada |
| Bank Address: | 90 Sparks Street, 2nd Floor, Ottawa, Ontario, K1P 5T6, Canada |
| Bank Number: | 003 |
| Account Name: | Wi-LAN Inc. |
| ABA No.: | 021 000 021 |
| Transit/Branch Number: | 00006 |
| Account Number: | 401-697-8 |
| SWIFT Code: | ROYCCAT2 |

No payment to be made hereunder shall be considered to be in default provided it is paid within thirty (30) days of the due date.

2.2    Acceleration of Royalty Payment. Notwithstanding any other provision hereof, if any amount(s) of the Royalty remain(s) unpaid by the Licensee immediately prior to the consummation of any Acquisition involving the sale of all or substantially all of the assets of the Licensee and/or of any of its Subsidiaries to any Acquirer (as defined below), all such unpaid amounts of the Royalty shall become due and payable immediately preceding the consummation of such Acquisition and shall be paid by the Licensee to Wi-LAN pursuant to the provisions of Section 2.1 hereof prior to the consummation of such Acquisition unless the Acquirer has agreed in writing to assume the Licensee's obligation hereunder and Wi-LAN has consented in writing to such assumption, which consent shall not be unreasonably withheld or delayed.

2.3    Interest. If the Licensee fails to make any payment required hereunder within thirty (30) days following the date required therefor, without limiting any of Wi-LAN's related remedies hereunder or pursuant to applicable laws, the Licensee shall pay Supplemental Royalties to Wi-LAN upon such unpaid amount(s) for each month or portion of a month that such payment remains unpaid following the date originally required for the payment thereof.

2.4    Time.  Time shall be of the essence of each provision of this Article II.

ARTICLE III

EFFECTIVE DATE, TERM AND TERMINATION

3.1    Effective Date.  This Agreement shall become effective on and as of the Effective Date and shall

remain in effect until the expiration of the Term. If this Agreement has not been terminated in accordance with the provisions of this Article III, the Licensee may extend the Term to December 30, 2029 by written notice to Wi-LAN to be delivered no later than October 31, 2019 provided that the Licensee shall pay CDN$400,000 to Wi-LAN by way of the payment of CDN$50,000 on or before each of November 30, 2019, February 28, 2020, May 31, 2020, August 31, 2020, November 30, 2020, February 28, 2021, May 31, 2021 and August 31, 2021 by wire transfer as set out in Section 2.1 hereof. If the Term is so extended, the provisions of this Agreement shall remain in full force and effect for such extended Term unless this Agreement is earlier terminated in accordance with the provisions of this Article III.

3.2     Termination for Failure to Make Payments. Wi-LAN may terminate this Agreement upon thirty (30) days' advance written notice if Wi-LAN is not paid any amounts due and payable hereunder when due and not in default. Any such termination and written notice of termination shall not be effective, however, if during such thirty (30) day advance written notice period, the Licensee pays to Wi-LAN all amounts so owing to Wi-LAN by the Licensee hereunder at that time.

3.3     Termination by Wi-LAN for Default. In addition to the provisions of Section 3.2 hereof, upon any material default by the Licensee in the observance or performance of any term hereof, Wi-LAN may terminate this Agreement upon sixty (60) days' advance written notice to the Licensee provided, however, that if the Licensee remedies such default within sixty (60) days after receipt from Wi-LAN of such written notice, then Wi-LAN shall not have the right to terminate this Agreement as a result of such default.

3.4     Effect of Termination. Upon the end of the Term, subject to any renewal or extension thereof or upon any termination of this Agreement pursuant to any of Sections 3.2 or 3.3 hereof, all rights and licenses granted to the Licensee and its Subsidiaries hereunder shall immediately terminate and be of no further force and/or effect provided, however, that the rights, licenses and releases applicable to the Subject Products made, sold, re-sold, distributed, licensed, leased, imported or otherwise disposed of by Licensee and its Subsidiaries (including their Channel Partners) prior to any expiration or termination (other than a termination for material breach by Licensee) of this Agreement shall survive such expiration or termination if the full amount of the Royalty and all related amounts have been paid in full by the Licensee to Wi-LAN.

3.5     Survival. Subject to the provisions of Section 3.4 hereof, the provisions of Section 1.3 and Articles II, III, IV, VI and VII hereof and any related applicable provisions of the Schedules hereto shall survive the end of the Term or any termination of this Agreement all in accordance with their respective terms.

3.6     Bankruptcy. All rights, licenses, releases, and privileges, granted under or pursuant to this Agreement by Wi-LAN are, and shall be deemed to be, for the purposes of Section 365(n) of the United States Bankruptcy Code, Section 65.11(7) of the *Bankruptcy and Insolvency Act* (Canada), and any other similar provisions of any other bankruptcy or insolvency legislation of any jurisdiction (collectively, "Bankruptcy Legislation"), licenses of rights to "intellectual property". The Parties agree that the Licensee and its Subsidiaries shall retain and may fully exercise all of their respective rights and elections as provided pursuant to the Bankruptcy Legislation. The Parties further agree that, if any proceeding shall be instituted by or against Wi-LAN seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization or relief of debtors, or seeking an entry of an order for relief or the appointment of a receiver, trustee or other similar official for Wi-LAN or any substantial part of its or their property or if Wi-LAN shall take any action to authorize any of the foregoing actions, subject to applicable laws, the Licensee and its Subsidiaries shall have the right to retain and enforce their respective rights under this Agreement.

ARTICLE IV
CONFIDENTIALITY

4.1     Confidentiality.  The Parties shall keep the terms and conditions of this Agreement confidential and shall not disclose the same or any portion thereof by press release, in securities filings or otherwise, to any third party except:

(a)     with the prior written consent of the other Party;

(b)     pursuant to the order of any governmental, judicial or quasi-judicial body having the jurisdiction to call therefor provided, however, that the Party with the obligation to so disclose provide the other Party with not less than thirty (30) days prior written notice of such obligation or sooner if the order requires earlier disclosure so that the recipient receives notice prior to such disclosure;

(c)     as otherwise required by applicable laws (including with respect to securities matters) provided, however, that the Party required to so disclose provide the other Party with not less than thirty (30) days prior written notice of such requirement or sooner if the law requires earlier disclosure so that the recipient receives notice prior to such disclosure;

(d)     during the course of any litigation so long as the disclosure of such terms and conditions are restricted in the same manner as is the confidential information of the other litigating parties and so long as the restrictions are embodied in a court-entered protective order provided further, however, that the Party proposing to so disclose provide the other Party with not less than thirty (30) days prior written notice of such disclosure or sooner if the order requires earlier disclosure so that the recipient receives notice prior to such disclosure;

(e)     in confidence to the disclosing Party's professional advisors; and

(f)     Wi-LAN may disclose the existence of this Agreement and the nature of the Subject Products to its licensees and prospective licensees and the Licensee may disclose the existence of this Agreement and the nature of the Subject Products to its current and prospective customers, acquirers, investors and lenders.

The Parties expressly understand and acknowledge that no breach of this Section 4.1 shall be grounds to terminate this Agreement or any of the rights, privileges, licenses, duties or obligations of either Party hereunder.

ARTICLE V
ACQUISITIONS

5.1     Assignment. Subject to the provisions of Sections 2.2 and 5.2 hereof, the Licensee may wholly or partially assign this Agreement (together with the Licensee's rights, duties, obligations and responsibilities hereunder) to a third party upon an Acquisition (any such third party, an "Acquirer") provided that the Licensee shall provide written notice regarding such Acquisition (including the identity of the acquirer or Acquirer (as the case may be)) to Wi-LAN no later than (a) ten (10) days prior to the consummation of such Acquisition if the amount of the Royalty has not been fully paid at such date or (b) thirty (30) days following the consummation of such Acquisition if the amount of the Royalty has been fully paid at that date.

5.2     Acquisition of the Licensee or Any Subsidiary of the Licensee.  Upon and following any Acquisition by any Acquirer of (a) the Licensee or of any Subsidiary of the Licensee, (b) all or substantially all of the assets of the Licensee or of any Subsidiary of the Licensee or (c) any business or product line of the Licensee or of any Subsidiary of the Licensee, to which notice has been provided to Wi-LAN in accordance with Section 5.1 hereof, the Acquirer shall be deemed to be the Licensee

hereunder but (i) only to the actual extent to which the Acquirer acquires the Licensee, such Subsidiary of the Licensee or any such assets, business or product line(s) thereof and (ii) the Acquirer shall not be entitled to the benefit of any of the releases or licenses provided in this Agreement in relation to any products made, imported, used, leased, offered for sale, sold, transferred and/or otherwise disposed by the Acquirer or any of its Subsidiaries prior to the consummation of such Acquisition.

5.3     Acquisition by the Licensee or Any Subsidiary of the Licensee.   Upon and following any Acquisition by the Licensee or by any Subsidiary of the Licensee of (a) any third party, (b) all or substantially all of the assets of any third party, or (c) any business or product line of any third party: (i) none of the products made, imported, used, leased, offered for sale, sold, transferred and/or otherwise disposed by such third party or any of its Subsidiaries prior to the consummation of such Acquisition shall be entitled to the benefit of any of the releases or licenses provided in this Agreement; and (ii) any products of the Licensee or such Subsidiary of the Licensee that derive from such third party and/or Acquisition, the sale, lease, licensing or other disposal of which products by the Licensee and/or any of its Subsidiaries results in an increase to the Licensee's revenues (on a consolidated basis together with all of its Subsidiaries) of more than fifty percent (50.0%) in each calendar year following such Acquisition from its revenues (on a consolidated basis together with all of its Subsidiaries) in the calendar year immediately preceding such Acquisition, shall be deemed not to be Subject Products and such products and their sale, lease, licensing or other disposal shall not be licensed hereunder.

5.4     Responsibilities of the Assignees. Any Subsidiary of the Licensee that ceases to be controlled by the Licensee shall continue to benefit from the licenses, rights and releases provided under this Agreement in respect to its Subject Products that were commercially available as of its Departure Date (including any future products of any such former Subsidiary that directly derive or extend from such Subject Products following such Departure Date) provided, however, that (a) if the Term is extended following such Departure Date, the extended Term shall not apply to such Subsidiary and (b) the licenses and rights granted under this Agreement, and the releases given under this Agreement, shall not extend to the products, services, or methods of any Person that may acquire control or become affiliated with such Subsidiary and also shall not extend to any new products, services or methods that are made commercially available by such Subsidiary after its Departure Date.

5.5     Subsequent Assignments. Any assignment or transfer by Wi-LAN of any of the Licensed Patents shall be expressly subject to the licenses, rights and releases granted by Wi-LAN in this Agreement. Wi-LAN shall require any assignee or transferee of any of the Licensed Patents to agree in writing to comply with the licenses, rights and releases granted by Wi-LAN in this Agreement.

ARTICLE VI
DISCLAIMERS AND RELATED MATTERS

6.1     Disclaimers. Nothing contained in this Agreement is intended to be or shall be construed as:

(a)     a representation or warranty by Wi-LAN or any of its Subsidiaries as to the validity or scope of any Patents;

(b)     a representation or warranty by Wi-LAN or any of its Subsidiaries that any manufacture, sale, lease, use, transfer or other disposition of any Subject Product will be free from infringement of Patents owned by third parties;

(c)     an agreement or obligation to bring or prosecute actions against third parties or conferring any right to bring or prosecute actions against third parties;

(d)     a requirement that Wi-LAN or any of its Subsidiaries file, maintain or secure any Patent in any jurisdiction or jurisdictions; or

(e)    conferring by implication, estoppel or otherwise, upon the Licensee or any of its Subsidiaries, any license, right or privilege under any Patent or otherwise, except the licenses, rights and privileges expressly granted hereunder.

6.2    <u>Wi-LAN Representations</u>. Wi-LAN represents and warrants that: (a) it has the full right and power to grant the rights, licenses and releases set forth in this Agreement; (b) it has not made and will not make any commitments to others that in derogation of such rights, licenses and releases; and (c) at the Effective Date, to its knowledge after reviewing the Licensee's publicly available material on its Internet website, no current products or services of the Licensee or its Subsidiaries infringe any of the Patents listed on <u>Schedule "B"</u> hereto.

6.3    <u>Covenant of Wi-LAN</u>. If during the Term, Wi-LAN, any of its Subsidiaries or their respective successors or assigns asserts that any product of the Licensee or any of its Subsidiaries infringes any claim of any Patent listed on <u>Schedule "B"</u> hereto, then Wi-LAN shall license each such Patent to the Licensee and each of its Subsidiaries upon the terms generally contained in this Agreement provided that the Licensee shall pay to Wi-LAN additional amounts with respect to each product covered by such license on a running royalty basis during the term of such license equal to the amounts that Wi-LAN is required to pay to any third party in relation to such license.

6.4    <u>Relating to Royalties</u>. Without limiting the generality of any other provision of this Agreement, in the event of any invalidation, failure to issue, legal action (whether successful or not) or other similar action relating to any Licensed Patent, the Licensee's obligation to pay the Royalty or any portion thereof, whether already paid or to be paid in the future, shall not be affected, terminated or reduced in any way whatsoever.

6.5    <u>Covenant of the Licensee</u>. The Licensee hereby covenants and agrees that it shall not, directly or indirectly, (a) bring or prosecute any judicial, administrative or other proceeding of any kind in any jurisdiction against Wi-LAN during or after the Term based on any claim or contention that any Licensed Patent is invalid, unenforceable, not infringed or has been misused (a "<u>Proceeding</u>"), (b) cause, induce or authorize a Proceeding to be brought by a third party against Wi-LAN or (c) assist, participate or cooperate in a Proceeding. The Parties expressly understand and acknowledge that any breach of this Section 6.5 shall be deemed to be a material default under this Agreement.

ARTICLE VII
GENERAL PROVISIONS

7.1    <u>English Language</u>.  This Agreement is in the English language only, which language shall be controlling in all respects and any versions hereof in any other language shall be for accommodation only and shall not be binding upon the Parties. All communications and notices to be made or given pursuant to this Agreement shall be in the English language.

7.2    <u>Choice of Law and Attornment</u>.  This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein without regard to any conflict of laws principles.

7.3    <u>Dispute Resolution</u>.

(a)    In the event of a dispute, controversy or claim arising under this Agreement (a "<u>Dispute</u>"), senior executives of the Parties shall meet in the City of Ottawa, Ontario as soon as reasonably possible but not later than thirty (30) days after the sending of a written notice of a Dispute and shall engage in good faith negotiations aimed at resolving the Dispute. If the Parties are unable to satisfactorily resolve a Dispute within an additional thirty (30) days from the date of the senior

level meeting, either Party may submit the Dispute to arbitration as provided for in sub-section 7.3(b) hereof.

(b)      If a Dispute has not been resolved in accordance with sub-section 7.3(a) hereof, such Dispute shall be subject to and settled by arbitration administered by the American Arbitration Association in accordance with the Rules by a single arbitrator agreed upon by the Parties or, failing any such agreement within sixty (60) days of the submission by either Party of a written notice of intention to arbitrate, appointed in accordance with the Rules. An award rendered by any such arbitrator shall be final and binding upon the Parties and judgment on the arbitrator's award may be entered in any court having jurisdiction thereof. The place of arbitration shall be the City of Ottawa, Ontario. The prevailing Party in any such arbitration shall be entitled to an award of reasonable attorney fees and related expenses.  For clarity, any dispute, controversy or claim involving the ownership, validity, infringement or enforceability of any of the Licensed Patents shall not be submitted to or settled by arbitration as set forth herein

(c)      Notwithstanding any other provision of this Agreement, either Party may seek injunctive or other equitable relief whenever the facts or circumstances would permit such Party to seek such equitable relief in a court of competent jurisdiction whether in lieu of, in addition to, or prior to initiation of any arbitration as set forth above.

7.4      Interpretation Generally.  The recitals to this Agreement shall be considered an integral part of this Agreement. The division of this Agreement into articles, sections, subsections and clauses and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "this Agreement", "hereof ", "herein", "hereunder" and similar expressions refer to this Agreement and the schedules to this Agreement and not to any particular article, section, subsection, clause or other portion hereof and include any agreement or instrument supplementary or ancillary hereto. In this Agreement, and the schedules to this Agreement unless there is something in the subject matter or context inconsistent therewith: (a) words in the singular number include the plural and such words shall be construed as if the plural had been used; and (b) words in the plural include the singular and such words shall be construed as if the singular had been used. Each Party acknowledges that it and its legal counsel have reviewed and participated in settling the terms of this Agreement, and the Parties hereby agree that any rule of construction to the effect that any ambiguity is to be resolved against the drafting Party shall not be applicable in the interpretation of this Agreement.

7.5      Further Assurances.  Wi-LAN and the Licensee hereby covenant and agree that at any time and from time to time after the Effective Date each will, upon the request of the other, do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, deeds, assignments, transfers, conveyances and assurances as may reasonably be required for the better carrying out and performance of all the terms of this Agreement.

7.6      Notices.  Any notice, designation, communication, request, demand or other document, required or permitted to be given or sent or delivered hereunder to a Party shall be in writing and shall be sufficiently given or sent or delivered if it is delivered personally to an officer or director of such Party or sent to the Party entitled to receive it by registered mail, fax or E-mail as follows:

(a)      in the case of Wi-LAN, to:
         Wi-LAN Inc.
         11 Holland Avenue, Suite 608
         Ottawa, ON  K1Y 4S1 Canada
         Attention: General Counsel
         Fax: (613) 688-4894
         E-mail: legal@wilan.com

(b)      in the case of the Licensee, to:
         BelAir Networks Inc.
         603 March Road
         Kanata, ON  K2K 2M5  Canada
         Attention: Chief Financial Officer
         Fax: _____
         E-mail: prose@belairnetworks.com

WI-LAN INC. PATENT LICENSE AGREEMENT

with a copy to:

LaBarge Weinstein Profession Corp.
515 Legget Drive, Suite 800
Ottawa ON K2K 3G4
Attention: Deborah Weinstein
Fax: 613-599-0018
Email: dw@lwlaw.com

or to such other address, fax number or E-mail address as the receiving Party shall have communicated to the sending Party.

7.7     Successors and Assigns.  Subject to the provisions of Article V hereof, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing herein, express or implied, is intended to confer upon any Person, other than the Parties and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

7.8     No Partnership, Etc.  Nothing in this Agreement shall be construed as creating a partnership, joint venture, or other formal business organization whatsoever between Wi-LAN and the Licensee.

7.9     Entire Agreement.  This Agreement and the schedules to this Agreement constitute the entire agreement between the Parties respecting the matters hereto and supersede all prior agreements, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof.  Neither Party shall be bound or charged with any oral or written agreements, representations, warranties, statements, promises, information, arrangements or understandings not specifically set forth herein.

7.10    Severability.  Any provision of this Agreement or the schedules to this Agreement which is invalid, prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such severed provision in any other jurisdiction. The Parties agree in good faith to reformulate any such invalid, prohibited or unenforceable provision to preserve the original intentions and objectives hereof and to remove such illegality, invalidity or unenforceability to the extent possible without materially reducing the value of this Agreement to either Party.

7.11    Amendments.  No modification or amendment to this Agreement and the schedules to this Agreement may be made unless specifically agreed to by the Parties in writing.

7.12    Counterparts.  This Agreement may be executed in several counterparts, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument.

        IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed as of the date first written above by their respective duly authorized officers.

WI-LAN INC.                              BELAIR NETWORKS INC.

Signed: _____        Signed: _____

Name: _____         Name: Peter Rose

Title: _____         Title: CFO

WI-LAN INC. PATENT LICENSE AGREEMENT

8

Schedule "A"
Definitions

"Acquisition" includes, without limitation, any acquisition by a Person of (a) any other Person, (b) all or substantially all of the assets of any other Person, (c) any business of any other Person or (d) any product line of any other Person, in each case by way of an acquisition of shares or assets, merger, amalgamation or any other method whatsoever.

"DSL Product" means any product or component that conforms to, relies upon or uses any digital subscriber line (DSL) standards including, without limitation, each of ADSL2 (ITU-T G.992.3 and ITU-T G.992.4) and ADSL2+ (ITU-T G.992.5) standards.

"Channel Partners" means any Person that provides services or sells products of the Licensee such as value-added resellers, managed service providers, systems integrators, original equipment manufacturers (whether under private, white label or otherwise) and distributors.

"control" means, for the purposes of this Agreement, with respect to any Person (a) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of that Person or otherwise direct the affairs of that Person, whether through ownership of equity participation, voting securities, beneficial interest, contract relating to voting rights or corporate governance, or otherwise, or (b) the ownership, directly or indirectly, of more than fifty percent (50%) of the voting securities or other ownership interest of that Person; provided in each such case, that if applicable laws restrict foreign ownership, such control will be established by direct or indirect ownership of a minimum ownership percentage that may, under such applicable laws, be owned by foreign interests, and all cognate terms shall have similar meanings.

"Departure Date" means, in respect to a Subsidiary of the Licensee, the date on which such Subsidiary ceased to be a Subsidiary of the Licensee

"Licensed Patents" means all Patents owned or controlled by Wi-LAN and/or its Subsidiaries at any time during the Term (including any extension of the Term as contemplated hereunder) but expressly excluding any Patent with respect to which, if a license or sub-license (as the case may be) were granted to the Licensee, Wi-LAN would be required to pay a royalty or other payment to any third party including, without limitation, those Patents listed in Schedule "B" to the Agreement.

"Patents" means any patents and applications, utility models and design patents, and all provisionals, continuations, continuations-in-part, divisionals, reissues, reexaminations and extensions thereof.

"Person" means and includes any individual, corporation, partnership, firm, joint venture, syndicate, association, trust, government, governmental agency or board or commission or authority, and any other form of entity or organization.

"Rules" means the rules and procedures of the American Arbitration Association, or any successor entity thereto.

"Subject Products" means any and all products, components or devices made, imported, leased, offered for sale, sold, re-sold, re-distributed, transferred and/or otherwise disposed of by, for or on behalf of the Licensee and/or any Subsidiary of the Licensee that in any way whatsoever infringes any invention(s) claimed in any Licensed Patent provided that no DSL Product shall be or shall be deemed to be a Subject Product.

"Subsidiary" means any corporation that is controlled by (a) a specified corporation, (b) a specified corporation and any one or more other corporations, each of which other corporations is controlled by that specified corporation or (c) two or more corporations, each of which corporation are controlled by a specified corporation.

"Supplemental Royalties" means, with respect to a specified amount to be paid by the Licensee to Wi-LAN, a supplemental monthly amount equal to one and one-half percent (1½%) (being an annual amount of eighteen percent (18%)) of such specified amount.

"Term" means the period commencing on the Effective Date and ending on the earlier of (a) December 30, 2019 unless such date is otherwise extended in accordance with the provisions of Section 3.1 of the Agreement and (b) the date on which the Agreement is otherwise terminated pursuant to Article III of the Agreement.

Schedule "B"
Certain Patents

| Country | Serial No. | Patent No. | Title |
|---|---|---|---|
| CA | 2214605 | 2214605 | Automatic Broadcast Monitoring System |
| EP | 96903850.4 | 0813716 | Automatic Broadcast Monitoring System |
| JP | 1996-0526499 | | Automatic Broadcast Monitoring System |
| US | 08/894,941 | 6,061,056 | Television Monitoring System with Automatic Selection of Program Material of Interest and Subsequent Display Under User Control |
| CA | 2183280 | 2183280 | Centralized Broadcast Channel Real-Time Search System |
| DE | 19976011246 | 69711246 | Centralized Broadcast Channel Real-Time Search System |
| EP | 97935407.3 | 0978062 | Centralized Broadcast Channel Real-Time Search System |
| FR | 97935407.3 | 0978062 | Centralized Broadcast Channel Real-Time Search System |
| GB | 97935407.3 | 0978062 | Centralized Broadcast Channel Real-Time Search System |
| US | 09/242,328 | 6,810,526 | Centralized Broadcast Channel Real-Time Search System |
| CA | 2272064 | 2272064 | Method of Processing a Video Stream |
| DE | 19976011215 | 69711215 | Method of Processing a Video Stream |
| EP | 97913054.9 | 0940033 | Method of Processing a Video Stream |
| US | 09/308,266 | 6,415,000 | Method of Processing a Video Stream |
| CA | 2196930 | 2196930 | Video Sequence Recognition |
| DE | 19986013777 | 69813777 | Method and Apparatus for Recognizing Video Sequences |
| EP | 98901906.2 | 0958699 | Video Sequence Recognition |
| GB | 98901906.2 | 0958699 | Video Sequence Recognition |
| US | 09/341,980 | 6,633,651 | Method and Apparatus for Recognizing Video Sequences |
| CA | 2264176 | 2264176 | Real Time Structured Summary Search Engine |
| DE | 19976018798 | 69718798 | Real Time Structured Summary Search Engine |
| EP | 97937389.1 | 0922260 | Real Time Structured Summary Search Engine |
| FR | 97937389.1 | 0922260 | Real Time Structured Summary Search Engine |
| GB | 97937389.1 | 0922260 | Real Time Structured Summary Search Engine |
| US | 09/242,909 | 6,397,209 | Real Time Structured Summary Search Engine |
| US | 11/852,240 | | Multi-Tiered Quantization of Channel State Information in Multiple Antenna Systems |
| WO | PCT/CA2008/001570 | | Multi-Tiered Quantization of Channel State Information in Multiple Antenna Systems |
| US | 11/754,965 | | Quantization of Channel State Information in Multiple Antenna Systems |
| US | 11/852,206 | | Quantization of Channel State Information in Multiple Antenna Systems |
| WO | PCT/CA2008/001569 | | Quantization of Channel State Information in Multiple Antenna Systems |
| US | 12/107,047 | | Mitigation of Transmission Errors of Quantized Channel State Information Feedback in Multi Antenna Systems |
| WO | PCT/CA2009/000464 | | Mitigation of Transmission Error in Multi Antenna Systems |
| WO | PCT/CA2007/000587 | WO08/122103 | MIMO Detection Method and System |
| US | 12/594,177 | | Signal Detection in MIMO Communication System |
| US | 09/370,360 | 6,470,055 | Spectrally Efficient FQPSK, FGMSK, and FQAM for Enhanced Performance CDMA, TDMA, GSM, OFDN, and Other Systems |
| US | 09/370,361 | 6,665,348 | System and Method for Interoperable Multiple-Standard Modulation and code Selectable Feher's GMSK, Enhanced GSM, CSMA, TDMA, OFDM, and Third Generation CDMA, W-CDMA and B-CDMA |
| US | 10/205,478 | 7,133,456 | Modulation and Demodulation Format Selectable System |
| US | 11/105,295 | 7,079,584 | OFDM, CDMA, Spread Spectrum, TDMA, Cross-Correlated and Filtered Modulation |
| US | 11/107,516 | 7,110,433 | Spread Spectrum Cross Correlated and Filtered Modulated Systems |
| US | 11/294,656 | 7,133,471 | Demodulation of Multiple Signals |
| US | 11/502,720 | 7,418,028 | Agile RF Band OFDM Spread Spectrum and Cross Correlated Systems |
| US | 11/534,675 | 7,450,628 | Processor, Modulators and Transceivers for Spread Spectrum, CDMA, CSMA, OFDM, TDM, TDMA Cross Correlated and Filtered Systems |
| US | 11/552,491 | 7,457,385 | Antenna Systems, Receivers and Demodulators for Cross-Correlated and Other Systems |
| US | 11/552,936 | 7,426,248 | Receivers and Demodulators for TDMA and other Modulated Systems |
| US | 12/125,741 | 7,555,054 | Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks |
| US | 12/367,420 | | Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless |

# Exhibit E

# THOMPSON & KNIGHT LLP

### ATTORNEYS AND COUNSELORS

ONE ARTS PLAZA
1722 ROUTH STREET • SUITE 1500
DALLAS, TEXAS 75201-2533
(214) 969-1700
FAX (214) 969-1751
www.tklaw.com

RICHARD L. WYNNE, JR.

(214) 969-1386

richard.wynne@tklaw.com

AUSTIN
DALLAS
DETROIT
FORT WORTH
HOUSTON
NEW YORK

ALGIERS
LONDON
MONTERREY
PARIS

November 8, 2012

David B. Weaver
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746–7568

**VIA EMAIL**

Re:   *Wi–LAN v. Alcatel–Lucent et al.*, Case No. 6:10–CV–521 (E.D. Tex.)

Dear David:

As you are no doubt aware, Telefonaktiebolaget LM Ericsson ("LME") and Ericsson Inc. (collectively, "Ericsson") and Wi–LAN have differing interpretations of Article III, Section 1 of the November 1, 2007, Patent and Conflict Resolution Agreement ("CRA") . As has been explained in Ericsson's Motion for Summary Judgment, Ericsson believes that the patents asserted in the above-referenced lawsuit are undoubtedly covered by the covenant not to sue granted under that provision. Despite our differences of opinion regarding the scope of Article III, Section 1, it is beyond dispute that, in the event that the Court were to disagree with Ericsson's interpretation, Wi–LAN will be in breach of Article VII, Section 1 of the CRA, which provides:

> At LME's request, Wi–LAN will grant to LME and its AFFILIATES a non-exclusive license to make, have made, use, sell, offer for sale, lease or otherwise dispose of, and import LME PRODUCTS including UMTS/HSPA PRODUCTS and Wi–LAN agrees to grant such a license at most-favored licensee status as compared to *any* future licensee of WI–LAN.

LME made such a request almost eighteen months ago in my May 23, 2011, letter, yet Wi–LAN has refused even to respond to that request, much less actually comply with its contractual obligations.

As you are aware, Wi–LAN entered into a Patent License Agreement effective December 30, 2009, with BelAir Networks Inc. (the "BelAir Patent License"). As I explained in my letter of October 26, 2012, LME is now the Licensee under that BelAir Patent License by virtue of an assignment from BelAir. Nevertheless, if Wi–LAN in any way disputes that LME and Ericsson Inc. are fully licensed under the BelAir Patent License, LME demands that Wi–LAN grant to LME a license on terms that, are at a minimum, identical to those in the BelAir Patent License, including but not limited to Articles I, II, and V, as well as the renewal provisions, of the BelAir Patent License.

THOMPSON & KNIGHT LLP

November 8, 2012
Page 2


Although Ericsson is already licensed to the patents-in-suit in the above-referenced lawsuit under the BelAir Patent License and already covered by the covenant not to sue in the CRA, and despite the fact that the patents-in-suit are invalid and not infringed by any product or service of Ericsson, it will, unfortunately, take many more months and no less than an additional million dollars in legal fees and expenses for Ericsson to ultimately prove as much. Recently, Wi–LAN initiated a second lawsuit against Ericsson in Florida asserting another set of patents that are also already covered under both the CRA and the BelAir Patent License. Nevertheless, as with the present lawsuit, it will likely take many months and several million dollars in yet additional legal fees and expenses for Ericsson to have an opportunity to prove that it is, in fact, already licensed to the patents asserted in the new lawsuit and that those patents are, in fact, invalid and not infringed. In view of the facts and circumstances resulting from Wi–LAN's frivolous infringement claims, and in order to put an end to the protracted, expensive, and unnecessary lawsuits brought by Wi–LAN, Ericsson is presently willing to agree to take a license on terms that are, at a minimum, identical to those in the BelAir Patent License. Because Wi–LAN granted BelAir a very broad, essentially portfolio-wide license for $300,000.00 Canadian, an amount that is but a fraction of what Ericsson will otherwise have to spend defending itself further against Wi–LAN's unmeritorious infringement allegations, this is an unnecessary, yet practical way forward for Ericsson.

LME and Ericsson Inc. are filing amended answers and counterclaims to assert Wi–LAN's willful breaches of Article VII of the CRA. If Wi–LAN grants to LME the license as requested herein by November 15, 2012, LME and Ericsson Inc. will withdraw the counterclaims relating to Wi–LAN's breaches of Article VII.

Sincerely,

Richard L. Wynne, Jr.

cc:    General Counsel (via registered mail, fax: 613.688.4894, and legal@wilan.com)
       Wi–LAN Inc.
       11 Holland Avenue, Suite 608
       Ottawa, ON K1Y 4S1 Canada


RLW:ls

# Exhibit F

# Holland & Knight

10 St. James Avenue | Boston, MA 02116 | T 617.523.2700 | F 617.523.6850
Holland & Knight LLP | www.hklaw.com

Joshua C. Krumholz
(617) 573-5820
joshua.krumholz@hklaw.com

February 1, 2013

*VIA E-MAIL (CHUTTNER@VELAW.COM)*

Constance S. Huttner
Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040

      Re:    *Wi-LAN USA, Inc. et al v. Ericsson, Inc. et al.*, Case No. 1:12-23569-Civ

Dear Connie:

As you know, Wi-LAN USA, Inc. and Wi-LAN Inc. (collectively, "Wi-LAN") have asserted that certain products sold by Telefonaktiebolaget LM Ericsson ("LME") and Ericsson Inc. (collectively, "Ericsson") infringe U.S. Patent Nos. 8,027,298 (the "'298 patent"), 8,249,014 (the "'014 patent") and 8,229,437 (the "'437 patent"). As you also know, Ericsson strongly believes that Wi-LAN's claims of infringement are baseless and that the patents that Wi-LAN has asserted are not valid. It also believes just as strongly that Wi-LAN's claims are barred by the covenant not to sue provisions in the Patent and Conflict Resolution Agreement ("CRA") and the licensing provisions in the agreement between Wi-LAN and BelAir Networks Inc. ("BelAir") dated December 30, 2009.

In addition to those infirmities, we write regarding Wi-LAN's failures in two other respects. One involves Wi-LAN's failure to meet its obligations to offer reasonable and non-discriminatory licensing terms under IEEE policy. The other involves Wi-LAN's failure to comply with the most favored licensee terms under the CRA. Both are addressed below.

**Reasonable and Non-Discriminatory License**

Pursuant to IEEE policy and according to Letters of Assurance sent to the IEEE by both Wi-LAN and Ensemble Communications, Wi-LAN agreed to license the '298 and '014 patents "under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." *See* WIL-LMEAL-00010680, WIL-LMEAL-00010650, WIL-LMEAL-00010667, and WIL-LMEAL-00010677. To date, Wi-LAN has failed to comply with this

Constance S. Huttner
February 1, 2013
Page 2

obligation.  Please immediately provide Wi-LAN's terms for licensing the '298 and '014 patents in accordance with Wi-LAN's Letters of Assurance to the IEEE.

We also understand that NextWave Broadband Inc., the original assignee of the priority application for the '437 patent, provided Letters of Assurance covering the '437 patent as well. Please immediately provide Wi-LAN's terms for licensing the '437 patent under reasonable and non-discriminatory terms as well.

**Patent and Conflict Resolution Agreement**

As you know, Wi-LAN and LME entered into the CRA in 2008.  According to Article VII, Wi-LAN must offer, at LME's request, "a non-exclusive license to make, have made, use, sell, offer for sale, lease or otherwise dispose of, and import LME PRODUCTS … at most-favored licensee status as compared to any future licensee of Wi-LAN."  The products accused of infringement in the present litigation squarely fall within the definition of LME Products, as that term is used in the CRA.  LME therefore requests that Wi-LAN provide an offer consistent with this obligation.

Each of the above requests is made without prejudice to Ericsson's defenses in the litigation, including its strongly held belief that the patents are neither infringed nor valid, and that the claims are barred by the CRA and Wi-LAN's agreement with BelAir.  We look forward to hearing from you.

Very truly yours,

Joshua C. Krumholz

cc:     VE-WiLAN-LTE@velaw.com

#12296074_v1

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:12-23569-Civ - MIDDLEBROOKS/BRANNON

WI-LAN USA, INC. and WI-LAN INC.,

            Plaintiffs

vs.

TELEFONAKTIEBOLAGET LM
ERICSSON and ERICSSON INC.,

            Defendants.

_____/

## DECLARATION OF FRANK VECELLA

I, Frank Vecella, hereby declare as follows:

1.      I am the Associate General Counsel - Litigation for defendant, Ericsson Inc.

2.      All the facts set forth in this Declaration are true and correct, based upon my personal knowledge or upon my investigation on behalf of Telefonaktiebolaget LM Ericsson ("LME") and Ericsson Inc. I submit this Declaration in support of the Defendants' Motion for Summary Judgment.

3.      Since 1999, Ericsson has been represented by the law firm of McKool Smith PC ("McKool Smith") in connection with numerous patent-related disputes. McKool Smith has represented Ericsson in patent-related disputes involving technologies practicing the UMTS standards promulgated by 3GPP since at least May 2005.

4.      In October 2006, Wi-LAN accused Ericsson and Sony Ericsson Mobile Communications (USA), Inc., which was a joint venture between Sony Corporation and LME, of

infringing four Wi-LAN patents: U.S. Patent Nos. 5,282,222, RE37,802, 6,192,068, and 6,320,897 (collectively, the "Wi-LAN Patents").

5.     Thereafter, and before the dispute was resolved, Ericsson became aware that Wi-LAN had retained McKool Smith to assert the same Wi-LAN Patents against other companies. This fact created two serious problems for Ericsson: (1) it could not retain McKool Smith, with whom it had invested significant sums to educate it regarding Ericsson's products and technologies overlapping with the Wi-LAN Patents, if litigation with Wi-LAN ensued; and (2) in other litigation, McKool Smith would be taking positions contrary to Ericsson's interests.

6.     A dispute thereafter arose between Ericsson and Wi-LAN regarding Wi-LAN's retention of McKool Smith for litigation involving the Wi-LAN Patents and related technology.

7.     In or around February 2008, LME and Wi-LAN entered into a Patent and Conflict Resolution Agreement (the "Agreement"), with an effective date of November 1, 2007. A true and accurate copy of the Patent and Conflict Resolution Agreement is attached hereto as Exhibit A.

2

I declare under penalty of perjury under the laws of the United States pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this _13_th day of February, 2013.

Frank Vecella

# Exhibit A

## PATENT AND CONFLICT RESOLUTION AGREEMENT

This Patent And Conflict Resolution Agreement ("Agreement) is made as of the EFFECTIVE DATE, as herein defined in ARTICLE I, Section 4 of this Agreement, by and between Wi-LAN INC., a Canadian corporation, having a place of business at 608-11 Holland Avenue, Ottawa, Ontario, Canada K1Y 4S1, hereinafter referred to as "WI-LAN," and Telefonaktiebolaget L M Ericsson (Publ), a company duly established under the laws of Sweden, with organization number 556016-0680, having its registered office at SE-164 83 Stockholm, Sweden, hereinafter referred to as "LME".

WHEREAS WI-LAN owns various patents issued and applications for patents pending in various countries of the world, and LME and its AFFILIATES (as hereinafter defined) desire to obtain certain rights to such patents and patent applications (as hereinafter defined);

AND WHEREAS a specific condition of this Agreement, and a factor in the consideration to be paid by LME, is that the rights granted herein to LME do not extend to its suppliers, other than as specifically provided for under this Agreement;

AND WHEREAS the consideration to be received by WI-LAN under this Agreement includes the value to WI-LAN of the parties resolving any conflicts the McKool Smith law firm may have in representing WI-LAN and, accordingly, the payment of $100,000 to WI-LAN provided under this agreement represents a portion of the overall consideration to be received by WI-LAN, the remaining consideration being the value of the parties resolving any such conflicts that the McKool Smith law firm may have in representing WI-LAN.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, WI-LAN and LME hereby agree as follows:

## ARTICLE I:  DEFINITIONS

As used in this Agreement:

**I. Section 1.**     "ACTION" means any court or similar proceeding of any kind or nature whatsoever including, without limitation, any suit, complaint, or claim, which initiates a proceeding in, of or before any judicial, arbitral, governmental, administrative, regulatory or other body or forum of any kind or nature, in or of any jurisdiction or location, whether domestic, foreign or otherwise.

**I. Section 2.**     "AFFILIATE" means, with respect to a party, any person or entity directly or indirectly controlling, controlled by, or under common control with, such party.  For purposes of this definition, the term "controlled" (including the terms "controlled by" and "under common control with"), as used with respect to any person or entity, shall mean (a) the possession, directly or indirectly, of the power or ability to direct or cause the direction of the management or policies of that person or entity, or otherwise direct the affairs of such person or entity, whether through the ownership of equity participation, voting securities, beneficial interest, by contract relating to voting rights or corporate governance, or otherwise, or (b) the ownership, directly or indirectly, of more than fifty percent (50%) of the voting securities or other ownership interest of a person or entity.

**I. Section 3.**     "CUSTOMER" means any transferee to whom *LME PRODUCTS* are leased, sold or otherwise transferred by or on behalf of LME or its AFFILIATES.

**I. Section 4.**     "EFFECTIVE DATE" means November 1, 2007.

**I. Section 5.**     "FUTURE AGREEMENT" means any license agreement entered into between WI-LAN and LME or its AFFILIATES, after the EFFECTIVE DATE, with respect to UMTS/HSPA PRODUCTS.

**I. Section 6.**     "LME PRODUCTS" means any products which are sold or licensed by LME or its AFFILIATES.   For purposes of clarity, LME PRODUCTS also include products

manufactured in accordance with mask works, manufacturing drawings, circuit diagrams, specifications and/or software licensed or otherwise provided by LME or its AFFILIATES.

**I. Section 7.**   "TERM" means the period commencing on the EFFECTIVE DATE and ending on September 3, 2019.

**I. Section 8.**   "UMTS/HSPA PRODUCTS" means any PRODUCT complying with the 21-35 series of 3GPP agreed protocols and/or protocol standards issued by other relevant telecommunications standards setting body which include substantially corresponding to the 21-35 series of 3GPP agreed protocols irrespective of the frequency band (by way of non-limiting example, including the ETSI TS-125 protocols), as well as any new releases or updates of such protocols.

**I. Section 9.**   "WI-LAN PATENTS" means those patents set out in Schedule "A" including all related re-examinations, reissues, continuations, continuations-in-part, divisionals and continuing prosecution applications (and divisions thereof), requests for continued examination, provisional patent applications and any foreign equivalents to any of the foregoing including without limitation utility models and extensions thereof.

ARTICLE II:  RELEASE

**II. Section 1.**   In consideration of the payment of one hundred thousand, ($100,000.) as specified in Section 1 of ARTICLE V, WI-LAN hereby releases, acquits and forever discharges LME, its AFFILIATES, and their CUSTOMERS from any and all liability for infringement or alleged infringement of any WI-LAN PATENTS resulting from LME, its AFFILIATES, or its CUSTOMERS making, having made, importing, using, selling, offering to sell or otherwise disposing of LME PRODUCTS prior to the EFFECTIVE DATE of this Agreement.

**II. Section 2.**   All dollar amounts referred to in this Agreement are United States Dollars.

ARTICLE III: NON-ASSERT AND RELEASE

Page 3 of 15

**III. Section 1.**    Subject to the provisions of ARTICLE V hereof, WI-LAN hereby irrevocably covenants that neither WI-LAN nor its AFFILIATES will, directly or indirectly, alone or by, with or through others, cause, induce or authorize, or voluntarily assist, participate or cooperate in, the commencement, maintenance or prosecution of any ACTION seeking or having the tendency to establish any liability on the part of, or to exact any sanction or penalty, or any injunctive, equitable, legal, declaratory, administrative or other relief from or against, LME, its direct or indirect distributors, AFFILIATES, CUSTOMERS or any other individual or entity arising from, by reason of, or in connection with making, using, selling, offering to sell or importing LME PRODUCTS which would, but for this Agreement, infringe any WI-LAN PATENTS.  Notwithstanding the foregoing or the theory of patent exhaustion, the parties hereto agree that LME PRODUCTS are not licensed under this Section 1 of Article III and that WI-LAN reserves and retains all rights to sue or assert against LME'S suppliers or its AFFILIATES' suppliers (other than suppliers whose "making" is covered under the provisions of Section 2 of this Article) that LME PRODUCTS, or components thereof, infringe any WI-LAN PATENTS. In the event that Wi-LAN asserts any rights that it may have against a LME supplier or an AFFILIATE supplier then, with respect to components supplied to LME, WI-LAN's remedy shall not include injunctive relief with respect to components provided to LME, its direct or indirect distributors, AFFILIATES, CUSTOMERS or any other individual or entity by reason of, or in connection with making, using, selling, offering to sell or importing LME PRODUCTS. For greater certainty, WI-LAN does not reserve and retain rights to sue LME'S AFFILIATES as a result of supplying LME PRODUCTS or components thereof to LME.

**III. Section 2.**    With respect to the non-assert provision of Section 1, "making" shall include having a third party make LME PRODUCTS for the use and benefit of LME or its AFFILIATES, but only if (i) such LME PRODUCTS are sold by LME or its AFFILIATES exercising such rights under the trademarks, trade names or other commercial indicia of LME or its AFFILIATES (other than in the case of components not yet incorporated into finished products or in such cases where the inclusion of such trademarks, trade names, or other commercial indicia are contrary to a CUSTOMER requirement or a requirement of any governmental body), and (ii) said LME PRODUCTS are made by the third party using manufacturing drawings and specifications (a) originated by LME or its AFFILIATES or (b) originated by any third party specifically and exclusively for LME or its AFFILIATES. For

further certainty in understanding the limitations above in this Article III Section 2, WI-LAN (including its AFFILIATES) shall not make any claims under its WI-LAN PATENTS against LME or its AFFILIATES or its direct or indirect CUSTOMERS for direct infringement, inducement to infringe and/or contributory infringement relating to any hardware, software or component produced by a third party using manufacturing drawings and specifications (a) originated by LME or its AFFILIATES or (b) originating by any third party specifically and exclusively for LME or its AFFILIATES.

### ARTICLE IV: PATENTS OTHER THAN THE WI-LAN PATENTS

**IV. Section 1.**     With respect to patents other than the WI-LAN PATENTS (to which Article III of this Agreement applies), and subject to the provisions of ARTICLE V hereof, WI-LAN hereby agrees that no damages shall accrue against LME, or its direct or indirect distributors, AFFILIATES and CUSTOMERS for infringement of any patents that, on or after the EFFECTIVE DATE, are owned or controlled by WI-LAN where liability results from making, having made, importing, using, selling, offering to sell or otherwise disposing of LME'S UMTS/HSPA PRODUCTS and damages shall only accrue for such making, having made, importing, using, selling, offering to sell or otherwise disposing of UMTS/HSPA PRODUCTS beginning after such time as WI-LAN commences an ACTION against LME or its AFFILIATES relating to UMTS/HSPA PRODUCTS and infringement of said WI-LAN patents.

### ARTICLE V: PAYMENT

**V. Section 1.**     In consideration of the releases in respect of all past sales granted by WI-LAN as described in Section 1 of ARTICLE II, LME hereby agrees and undertakes to pay, or cause a third party to pay, to WI-LAN a non-refundable amount of one hundred thousand dollars ($100,000.) which shall be due and payable on the date of execution of this Agreement. Notwithstanding the foregoing, LME shall not be in default under this Section 1 until the date that is 60 days from the date of execution of this Agreement.

**V. Section 2.**     All payments from LME (or made on its behalf) to WI-LAN hereunder shall be made by means of telegraphic transfer remittance to:

Bank:  ROYAL BANK OF CANADA

Account Name: WI-LAN Inc.

Account Number: 401-697-8

Transit Number: 00006

Bank Number: 003

Swift Code: ROYCCAT2


## ARTICLE VI: EFFECTIVE DATE AND TERM

**VI. Section 1.**    This Agreement shall become effective on the EFFECTIVE DATE and shall remain in effect until the expiration of the TERM.

**VI. Section 2.**    All rights, privileges, releases, non-asserts and immunities granted under Article II, Article III, Article IV and Article VII of this Agreement shall survive the expiration of the TERM.


## ARTICLE VII: MOST-FAVOURED LICENSEE PROVISIONS

**VII. Section 1.**    In the event that Wi-LAN owns or controls the licensing of patents not already addressed under this Agreement and which are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS, WI-LAN hereby agrees that at any time during the TERM of this Agreement, at LME's request, WI-LAN will grant to LME and its AFFILIATES a non-exclusive license to make, have made, use, sell, offer for sale, lease or otherwise dispose of, and import LME PRODUCTS including UMTS/HSPA PRODUCTS and Wi-LAN agrees to grant such a license at most-favored licensee status as compared to any future licensee of WI-LAN.

**VII. Section 2.**    If a FUTURE AGREEMENT is entered into by the parties, and during the TERM WI-LAN has signed or signs any subsequent license with a similarly situated licensee that contemplates more favorable rates than the rates being paid in respect of UMTS/HSPA PRODUCTS by LME, then WI-LAN shall promptly notify LME of such license and shall offer the more favorable rates to LME as of the effective date of the FUTURE AGREEMENT or of

such subsequent license. For purposes of clarity, similarly situated licensees include, but are not limited to, licensees directly or indirectly making, using, selling, and offering for sale products or services in the wireless data, cellular handset, and wireless communications infrastructure markets.

**VII. Section 3.**   In order for a license to be considered to be at more favorable rates for a similarly situated licensee, it must be reasonably apparent that the rates are more favorable after considering all relevant factors including, but not limited to, nature of license, notice of infringement, volume of sales, types of sales and patent coverage.

**VII. Section 4.**   Notwithstanding the foregoing, in no event shall LME receive any refund or any amount paid, or which became due, to WI-LAN prior to the execution of a subsequent license with a similarly situated licensee.

**VII. Section 5.**   The provisions of this ARTICLE shall not apply in respect of any license signed by WI-LAN prior to the EFFECTIVE DATE.

**VII. Section 6.**   Any disputes regarding whether rates in any subsequent license with a similarly situated licensee are more favorable than those in any FUTURE AGREEMENT arising under Section 2 shall be determined by binding arbitration as provided herein. The arbitration shall be administered by the International Centre for Dispute Resolution of the American Arbitration Association in accordance with the American Arbitration Association Rules then in force (the "Rules"). Either party may commence arbitration by written notice to the other party stating the basis for the dispute. The arbitration shall be held before one arbitrator. In the event the parties are unable to select an arbitrator, the arbitrator shall be selected by the International Centre for Dispute Resolution in accordance with the Rules.

**VII. Section 7.**   By signing this Agreement, LME is neither admitting nor agreeing that it is or will ever be obligated to enter into a FUTURE AGREEMENT with WI-LAN, or that any LME PRODUCTS -- whether including UMTS/HSPA PRODUCTS or not -- infringe any of the WI-LAN PATENTS, or any other patents owned or controlled by WI-LAN. For its part, WI-LAN covenants and agrees that it will never claim, allege or suggest that LME's execution of this Agreement constitutes an admission of any kind that LME PRODUCTS -- whether including

UMTS/HSPA PRODUCTS or not -- infringe any patents owned or controlled by WI-LAN, now or hereafter.

## ARTICLE VIII: MISCELLANEOUS PROVISIONS

**VIII. Section 1.**   Nothing contained in this Agreement shall be construed as:

    (a)    a warranty or representation by WI-LAN or its AFFILIATES as to the validity or scope of any WI-LAN PATENT, as the case may be; or

    (b)    a warranty or representation that any manufacture, use, sale or other disposition of LME PRODUCTS hereunder will be free from infringement of patents, utility models and design patents, as well as applications therefor, reexaminations, reissues, continuations, divisions, continuations-in-part and extensions thereof, in all countries of the world, owned by third parties other than those under which rights and privileges have been granted; or

    (c)    an agreement to bring or prosecute actions or suits against third parties for infringement or conferring any right to bring or prosecute actions or suits against third parties for infringement; or

    (d)    conferring any right to use in advertising, publicity, or otherwise, any trademark, trade name or names, or any contraction, abbreviation or simulation thereof, of either party; or

    (e)    conferring by implication, estoppel or otherwise, upon any party hereunder, any license, right or privilege under any patent, utility model, design patent, or applications therefor, reexamination, reissue, continuation, division, continuation-in-part or extension, in any country of the world, except the rights and privileges expressly granted hereunder.

**VIII. Section 2.**   This Agreement and the rights and privileges granted hereunder shall inure to the benefit of the parties hereto and each party's permitted successors and assigns.  LME may not extend, assign or transfer any of the rights and privileges granted to it hereunder to any third party except as otherwise provided in this ARTICLE VIII Sections 3 and 4.  Either party hereto may assign its obligations and rights under this AGREEMENT at any time to an AFFILIATE, upon written notice to the other party, and provided such AFFILIATE agrees in writing to be bound by this AGREEMENT.

**VIII. Section 3.**   In case of an acquisition of LME or other event, in which all or a significant portion of the business of LME is assigned or transferred to another corporation, corporations, company, companies or other entity or entities (hereinafter "the Acquirer"), LME or the Acquirer shall promptly notify WI-LAN of such acquisition or other event.  The obligations, rights or privileges granted hereunder shall continue but do not extend to the Acquirer.

**VIII. Section 4.**   Acquisitions:

In the case of an Acquisition by LME or other event in which all or a significant portion of the business of another corporation or entity (hereinafter "the Acquired Business") is assigned or transferred to LME ("Acquired") then:

(a)     If, at the time it is Acquired, the Acquired Business DOES NOT make, use, sell, offer for sale, or import products, services, or technologies that, in the absence of a license from WI-LAN, would infringe, whether directly or through inducement of or contribution to infringement by another, at least one valid and enforceable claim of a WI-LAN PATENT, then the rights and privileged granted hereunder shall continue and shall extend to the Acquired Business; otherwise

(b)     If the Acquired Business makes, uses, sells, imports, or distributes LME PRODUCTS for the use and benefit of LME, or at the time it is Acquired, the Acquired Business is otherwise covered under the rights and privileges provided by this Agreement, then the rights and privileges granted hereunder shall continue and shall extend to the Acquired Business's making, using, selling, importing, or distributing of LME PRODUCTS; however, to the extent that the Acquired

Business made, used, sold, offered for sale or distributed products, services, or technologies to a third party that is not a direct or indirect distributor, AFFILIATE, or CUSTOMER of LME, the rights and privileges granted under Article III shall not extend to the Acquired Business; otherwise

(c)   If WI-LAN has neither commenced an ACTION against the Acquired Business nor provided written notice of infringement of at least one claim of a WI-LAN PATENT and the Acquired Business is Acquired during the pendency of, or within 24 months of the final disposition of, any Action in which WI-LAN is represented by McKool, Smith in relationship to the WI-LAN PATENTS or UMTS/HSPA PRODUCTS then the rights and privileged granted hereunder shall continue and shall extend to the Acquired Business; otherwise,

(d)   If the Acquired Business makes, uses, sells, imports, or distributes finished products sold under a mark or brand that is not a LME mark or brand and that are not for the use and benefit of LME ("NON-LME PRODUCTS") and, in the absence of a license from WI-LAN, such NON-LME PRODUCTS would infringe, whether directly or through inducement of or contribution to infringement by another, at least one valid and enforceable claim of a WI-LAN PATENT, then the rights and privileged granted hereunder shall not extend to the ACQUIRED BUSINESS's continued making, using, selling, importing or distributing of such NON-LME PRODUCTS;

(e)   otherwise, to the extent that the rights and privileges granted hereunder do not extend to the Acquired Business, the parties shall negotiate in good faith to determine the need for and, if needed reach agreement on, a license or other grant of rights in the WI-LAN PATENTS subject to Article IV and Article VII of this Agreement.

**VIII. Section 5.**   All rights, privileges, releases, non-assertions and immunities granted under or pursuant to this Agreement by each of the parties hereto are, and shall otherwise be deemed to be, for the purpose of Section 365(n) of the United States Bankruptcy Code, as amended (the

"Bankruptcy Code"), rights to "intellectual property" as defined under Section 101(35A) of the Bankruptcy Code. The parties hereto agree that each of the parties hereto shall retain and may fully exercise all of its rights and elections under the Bankruptcy Code. The parties hereto further agree that, in the event that any proceeding shall be instituted by or against a party hereto seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of that party or that party's debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking an entry of an order for relief or the appointment of a receiver, trustee or other similar official for that party or any substantial part of its property or if a party hereto shall take any action to authorize any of the foregoing actions (each a "Proceeding"), the other party shall have the right to retain and enforce its rights under this Agreement.

**VIII. Section 6.**    All notices required or permitted to be given hereunder shall be in writing and shall be valid and sufficient if dispatched by either facsimile transmission where receipt of the facsimile is confirmed by the recipient or by international courier (UPS, FEDEX, etc.) addressed as follows:

|  |  |
|---|---|
| If to LME: | Telefonaktiebolaget L M Ericsson (Publ) |
|  | Att: Vice President Licensing and Patent Development |
|  | Torshamnsgatan 23 |
|  | SE-164 80 Stockholm |
|  | Sweden |
|  | Facsimile No.: + 46 8 719 11 12 |
|  |  |
| If to WI-LAN: | WI-LAN Inc. |
|  | 608 - 11 Holland Avenue |
|  | Ottawa, Ontario, Canada   K1Y 4S1 |
|  | Attention:    General Counsel |
|  | Fax Number:  1-613-688-4894 |
|  | E-mail:      legal@wi-lan.com |

Either party hereto may change its address by a notice given to the other party in the manner set forth above.

**VIII. Section 7.**    No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.  No modification, alteration, addition or change in the terms hereof shall be binding on either party unless reduced to writing and duly executed by the parties.

**VIII. Section 8.**   No waiver by either party, expressed or implied, of any breach of any term, condition or obligation of this Agreement by the other party shall be construed as a waiver of any subsequent breach of that term, condition or obligation or of any other term, condition or obligation of this Agreement of the same or different nature.

**VIII. Section 9.**   This Agreement is in the English language only, which language shall be controlling in all respects, and all versions hereof in any other language shall be for accommodation only and shall not be binding upon the parties hereto.  All communications to be made or given pursuant to this Agreement shall be in the English language.

**VIII. Section 10.**  This Agreement and matters connected with the performance thereof shall be construed, interpreted, applied and governed in all respects in accordance with the laws of the state of New York, USA. By signing this Agreement the parties also consent to personal jurisdiction in New York and agree that any venue therein is an acceptable jurisdiction for any controversy or claim arising out of or related to this Agreement or any breach of this Agreement.

**VIII. Section 11.**  The parties hereto shall not now or hereafter publicly disclose any of the contents contained in this Agreement in a press release or by any other means, or to any third party except:

    (a)     to any CUSTOMERS, licensees or investors during the parties' ordinary course of business the existence of this Agreement and scope of the non-assert granted under ARTICLE III, but not the terms of other articles herein; or

Page 12 of 15

(b)      to any governmental body or court having jurisdiction to call therefor; or

(c)      as otherwise may be required by law; or

(d)      to legal counsel or other professional advisors acting for either party.

**VIII. Section 12.**  WI-LAN may not assign to any third party a patent subject to a grant of rights to LME, its AFFILIATES and their CUSTOMERS under this Agreement unless it secures the continued right to grant such rights to LME, its AFFILIATES, and their CUSTOMERS as provided under this Agreement including, but not limited to, the rights granted by Article III, Article IV and Article VII of this Agreement.

**VIII. Section 13.**  Each party and their respective AFFILIATES agree not to employ, retain or otherwise use the law firm McKool Smith against the other party.

**VIII. Section 14.**  This Agreement sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all previous agreements, negotiations, commitments and writings, if any, between the parties hereto relating thereto.  This Agreement may be executed in several counterparts, all of which together shall constitute one and the same instrument.

**VIII. Section 15.**  In this Agreement, unless there is something in the subject matter or context inconsistent therewith: (a) words in the singular number include the plural and such words shall be construed as if the plural had been used; (b) words in the plural include the singular and such words shall be construed as if the singular had been used, and (c) words importing the use of any gender shall include all genders where the context or party referred to so requires, and the rest of the sentence shall be construed as if the necessary grammatical and terminological changes had been made.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the EFFECTIVE DATE.

LME: (TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)

By: _____   Title: VICE PRESIDENT

Date: Feb 13, 2008

WI-LAN

By: _____   Title: SENIOR VICE PRESIDENT
Carl Olof Blomqvist

Date: Feb 13, 2008

WI-LAN

By: _____   Title: Vice President
(CURT DODD)   Patents & Counsel

Date: Feb 15, 2008

Page 14 of 15

## SCHEDULE "A"

- United States Patent #5,282,222
- United States Patent #RE37,802
- United States Patent #6,192,068
- United States Patent #6,320,897

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| WI-LAN INC., §<br>§<br>Plaintiff, §<br>§<br>v. §<br>§<br>ALCATEL-LUCENT USA INC.; §<br>TELEFONAKTIEBOLAGET LM §<br>ERICSSON; ERICSSON INC.; SONY §<br>ERICSSON MOBILE COMMUNICATIONS §<br>AB; SONY ERICSSON MOBILE §<br>COMMUNICATIONS (USA) INC.; HTC §<br>CORPORATION; HTC AMERICA, INC.; §<br>EXEDEA INC.; LG ELECTRONICS, INC.; §<br>LG ELECTRONICS MOBILECOMM U.S.A., §<br>INC.; LG ELECTRONICS U.S.A., INC. §<br>§<br>§<br>Defendant. §<br>§ | Civil Action No. 6:10-cv-521<br><br>JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT

Plaintiff Wi-LAN Inc. ("Wi-LAN") files this Original Complaint for patent infringement against Defendants Alcatel-Lucent USA Inc., Telefonaktiebolaget LM Ericsson, Ericsson Inc., Sony Ericsson Mobile Communications AB, Sony Ericsson Mobile Communications (USA) Inc., HTC Corporation, HTC America, Inc., Exedea Inc., LG Electronics, Inc., LG Electronics Mobilecomm U.S.A., Inc., and LG Electronics U.S.A., Inc. (individually and collectively, "Defendants") for infringement of one or more of U.S. Patent Nos. 6,088,326 (the "'326 Patent), 6,195,327 (the "'327 Patent"), 6,222,819 (the "'819 Patent"), and 6,381,211 (the "'211 Patent") (collectively, the "Patents-in-Suit") pursuant to 35 U.S.C. § 271.  Copies of the Patents-in-Suit are attached hereto as Exhibits A, B, C and D.

1

## PARTIES

1.     Plaintiff Wi-LAN Inc., is a corporation organized and existing under the laws of Canada with its principal place of business at 11 Holland Ave., Suite 608, Ottawa, Ontario, Canada.

2.     Upon information and belief, Alcatel-Lucent USA Inc. ("Alcatel-Lucent") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 600-700 Mountain Avenue, Murray Hill, New Jersey 07974.  Alcatel-Lucent manufactures for sale, sells, and/or offers for sale wireless communication products, including but not limited to products compliant with the 3GPP standard, in the United States and, more particularly, in the Eastern District of Texas.

3.     Upon information and belief, Defendant Telefonaktiebolaget LM Ericsson is a corporation organized and existing under the laws of the country of Sweden with its principal place of business at Torshamnsgatan 23, Kista, 164 83 Stockholm, Sweden.  Upon information and belief, Defendant Ericsson Inc. is a subsidiary of Defendant Telefonaktiebolaget LM Ericsson and is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 6300 Legacy Drive, Plano, Texas 75024.   Defendant Telefonaktiebolaget LM Ericsson and Defendant Ericsson Inc. are individually and collectively referred to herein as "Ericsson."  Ericsson manufactures for sale, sells, and/or offers for sale wireless communication products, including but not limited to products compliant with the 3GPP standard, in the United States and, more particularly, in the Eastern District of Texas.

4.     Upon information and belief, Defendant Sony Ericsson Mobile Communications AB is a corporation organized and existing under the laws of the country of Sweden with its principal place of business at Nya Vattentornet, Lund, Sweden SE-221 88.  Upon information and belief, Defendant Sony Ericsson Mobile Communications (USA) Inc. is a subsidiary of

2

Defendant Sony Ericsson Mobile Communications AB and is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 7001 Development Drive, Research Triangle Park, North Carolina 27709.  Defendant Sony Ericsson Mobile Communications AB and Sony Ericsson Mobile Communications (USA) Inc. are individually and collectively referred to herein as "Sony Ericsson."  Sony Ericsson manufactures for sale, sells, and/or offers for sale wireless communication products, including but not limited to products compliant with the 3GPP standard, in the United States and, more particularly, in the Eastern District of Texas.

5.       Upon information and belief, Defendant HTC Corporation (a/k/a High Tech Computer Corp.) is a corporation organized and existing under the laws of the country of Taiwan, R.O.C. with its principal place of business headquarters at 23 Xinghua Road, Taoyuan 330, Taiwan, R.O.C.  Upon information and belief, Defendant HTC America, Inc. is a subsidiary of Defendant HTC Corporation and is a corporation organized and existing under the laws of the state of Texas with its principal place of business at 13920 SE Eastgate Way, Suite 400, Bellevue, Washington 98005.   Upon information and belief, Defendant Exedea Inc. is a subsidiary of Defendant HTC Corporation and is a corporation organized and existing under the laws of the state of Texas with its principal place of business at 5950 Corporate Drive, Houston, Texas 77036.   Defendants HTC Corporation, HTC America, Inc., and Exedea Inc. are individually and collectively referred to herein as "HTC."  HTC manufactures for sale, sells, and/or offers for sale wireless communication products, including but not limited to products compliant with the 3GPP standard, in the United States and, more particularly, in the Eastern District of Texas.

6.     Upon information and belief, Defendant LG Electronics, Inc., is a company organized under the laws of the country of South Korea with its principal place of business at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul, 150-7-21, South Korea.   Upon information and belief, Defendant LG Electronics Mobilecomm U.S.A., Inc. is a subsidiary of Defendant LG Electronics, Inc. and is a company organized and existing under the laws of the state of California with its principal place of business at 10101 Old Grove Road, San Diego, California 92131.   Upon information and belief, Defendant LG Electronics U.S.A., Inc. is a subsidiary of Defendant LG Electronics, Inc. and is a company organized and existing under the laws of the state of New Jersey with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.   Defendants LG Electronics, Inc., LG Electronics Mobilecomm U.S.A., Inc., and LG Electronics U.S.A., Inc. are individually and collectively referred to herein as "LG."   LG manufactures for sale, sells, and/or offers for sale wireless communication products, including but not limited to products compliant with the 3GPP standard, in the United States and, more particularly, in the Eastern District of Texas

## JURISDICTION AND VENUE

7.     This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 271.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## THE PATENTS-IN-SUIT

10.     On July 11, 2000, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '326 Patent, entitled "Processing Data Transmitted and Received Over a Wireless Link Connecting a Central Terminal and a Subscriber Terminal of a Wireless

4

Telecommunications System" after a full and fair examination. Wi-LAN was assigned the '326 Patent and possesses all rights of recovery under the '326 Patent, including the right to recover damages for past infringement. A true and correct copy of the '326 Patent is attached hereto as Exhibit A.

11.      On February 27, 2001, the USPTO duly and legally issued the '327 Patent, entitled "Controlling Interference in a Cell of a Wireless Telecommunications System" after a full and fair examination. Wi-LAN was assigned the '327 Patent and possesses all rights of recovery under the '327 Patent, including the right to recover damages for past infringement. A true and correct copy of the '327 Patent is attached hereto as Exhibit B.

12.      On April 24, 2001, the USPTO duly and legally issued the '819 Patent, entitled "Processing Data Transmitted and Received Over a Wireless Link Connecting a Central Terminal and a Subscriber Terminal of a Wireless Telecommunications System" after a full and fair examination. Wi-LAN was assigned the '819 Patent and possesses all rights of recovery under the '819 Patent, including the right to recover damages for past infringement. A true and correct copy of the '819 Patent is attached hereto as Exhibit C.

13.      On April 30, 2002, the USPTO duly and legally issued the '211 Patent, entitled "Processing Data Transmitted and Received Over a Wireless Link Connecting a Central Terminal and a Subscriber Terminal of a Wireless Telecommunications System" after a full and fair examination. Wi-LAN was assigned the '211 Patent and possesses all rights of recovery under the '211 Patent, including the right to recover damages for past infringement. A true and correct copy of the '211 Patent is attached hereto as Exhibit D.

14.      Each of the Patents-in-Suit is valid and enforceable.

## COUNT I:  INFRINGEMENT OF THE '326 PATENT

15.    Upon information and belief, Alcatel-Lucent makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to 9311 Macro Node B, 9360 Small Cell, and 9926 Digital 2U Node B ("the accused Alcatel-Lucent products").

16.    Upon information and belief, the accused Alcatel-Lucent products support at least releases 5, 6, and 7 of the 3GPP standard.

17.    Upon information and belief, the accused Alcatel-Lucent products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

18.    Upon information and belief, Alcatel-Lucent has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '326 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to 9311 Macro Node B, 9360 Small Cell, and 9926 Digital 2U Node B, that fall within the scope of one or more of the claims of the '326 Patent.  Alcatel-Lucent contributes to and induces infringement through supplying the accused Alcatel-Lucent products to customers, and Alcatel-Lucent's customers who purchase the accused Alcatel-Lucent products and operate those products in accordance with Alcatel-Lucent's instructions directly infringe one or more claims of the '326 Patent.

19.    Upon information and belief, Ericsson makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to RBS-3000, RBS-6000, W30, and W35 ("the accused Ericsson products").

20.    Upon information and belief, the accused Ericsson products support at least releases 5, 6, and 7 of the 3GPP standard.

21.     Upon information and belief, the accused Ericsson products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

22.     Upon information and belief, Ericsson has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '326 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to RBS-3000, RBS-6000, W30, and W35, that fall within the scope of one or more of the claims of the '326 Patent. Ericsson contributes to and induces infringement through supplying the accused Ericsson products to customers, and Ericsson's customers who purchase the accused Ericsson products and operate those products in accordance with Ericsson's instructions directly infringe one or more claims of the '326 Patent.

23.     Alcatel-Lucent and Ericsson, by way of their infringing activities, have caused and continue to cause Wi-LAN to suffer damages, and Wi-LAN is entitled to recover from Alcatel-Lucent and Ericsson damages in an amount to be determined at trial.

24.     Wi-LAN has no adequate remedy at law against the Alcatel-Lucent's and Ericsson's acts of infringement, and unless Alcatel-Lucent and Ericsson are enjoined from their infringement of the '326 Patent, Wi-LAN will suffer irreparable harm.

25.     Wi-LAN reserves the right to allege, after discovery, that infringement of the '326 Patent by one or more of these Defendants is willful and deliberate, entitling Wi-LAN to increased damages under 35 U.S.C. § 284 and to attorney's fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT II:  INFRINGEMENT OF THE '327 PATENT

26.     Upon information and belief, Alcatel-Lucent has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '327 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN,  products compliant with the 3GPP standard, including but not limited to 9311 Macro Node B, 9360 Small Cell, and 9926 Digital 2U Node B, that fall within the scope of one or more of the claims of the '327 Patent.  Alcatel-Lucent contributes to and induces infringement through supplying the accused Alcatel-Lucent products to customers, and Alcatel-Lucent's customers who purchase the accused Alcatel-Lucent products and operate those products in accordance with Alcatel-Lucent's instructions directly infringe one or more claims of the '327 Patent.

27.     Upon information and belief, Ericsson has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '327 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to RBS-3000, RBS-6000, W30, and W35, that fall within the scope of one or more of the claims of the '327 Patent.  Ericsson contributes to and induces infringement through supplying the accused Ericsson products to customers, and Ericsson's customers who purchase the accused Ericsson products and operate those products in accordance with Ericsson's instructions directly infringe one or more claims of the '327 Patent.

28.     Alcatel-Lucent and Ericsson, by way of their infringing activities, have caused and continue to cause Wi-LAN to suffer damages, and Wi-LAN is entitled to recover from Alcatel-Lucent and Ericsson damages in an amount to be determined at trial.

29.     Wi-LAN has no adequate remedy at law against the Alcatel-Lucent's and Ericsson's acts of infringement, and unless Alcatel-Lucent and Ericsson are enjoined from their infringement of the '327 Patent, Wi-LAN will suffer irreparable harm.

30.     Wi-LAN reserves the right to allege, after discovery, that infringement of the '327 Patent by one or more of these Defendants is willful and deliberate, entitling Wi-LAN to increased damages under 35 U.S.C. § 284 and to attorney's fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT III:  INFRINGEMENT OF THE '819 PATENT

31.     Upon information and belief, Alcatel-Lucent makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to 9311 Macro Node B, 9360 Small Cell, and 9926 Digital 2U Node B.

32.     Upon information and belief, the accused Alcatel-Lucent products support at least releases 5, 6, and 7 of the 3GPP standard.

33.     Upon information and belief, the accused Alcatel-Lucent products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

34.     Upon information and belief, Alcatel-Lucent has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '819 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to 9311 Macro Node B, 9360 Small Cell, and 9926 Digital 2U Node B, that fall within the scope of one or more of the claims of the '819 Patent.  Alcatel-Lucent contributes to and induces infringement through supplying the accused Alcatel-Lucent products to customers, and Alcatel-Lucent's customers who purchase the

accused Alcatel-Lucent products and operate those products in accordance with Alcatel-Lucent's instructions directly infringe one or more claims of the '819 Patent.

35.    Upon information and belief, Ericsson makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to RBS-3000, RBS-6000, W30, and W35.

36.    Upon information and belief, the accused Ericsson products support at least releases 5, 6, and 7 of the 3GPP standard.

37.    Upon information and belief, the accused Ericsson products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

38.    Upon information and belief, Ericsson has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '819 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to RBS-3000, RBS-6000, W30, and W35, that fall within the scope of one or more of the claims of the '819 Patent.  Ericsson contributes to and induces infringement through supplying the accused Ericsson products to customers, and Ericsson's customers who purchase the accused Ericsson products and operate those products in accordance with Ericsson's instructions directly infringe one or more claims of the '819 Patent.

39.    Upon information and belief, Sony Ericsson makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to Vivaz, Xperia X10, Equinox, W518a, Satio, Xperia X2a, Xperia Pureness, Aino, and Naite ("the accused Sony Ericsson products").

40.     Upon information and belief, the accused Sony Ericsson products support at least releases 5, 6, and 7 of the 3GPP standard.

41.     Upon information and belief, the accused Sony Ericsson products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

42.     Upon information and belief, Sony Ericsson has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '819 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to Vivaz, Xperia X10, Equinox, W518a, Satio, Xperia X2a, Xperia Pureness, Aino, and Naite, that fall within the scope of one or more of the claims of the '819 Patent.  Sony Ericsson contributes to and induces infringement through supplying the accused Sony Ericsson products to customers, and Sony Ericsson's customers who purchase the accused Sony Ericsson products and operate those products in accordance with Sony Ericsson's instructions directly infringe one or more claims of the '819 Patent.

43.     Upon information and belief, HTC makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to Aria, HD2, Imagio, Pure, Tilt 2, Touch Cruise, G1, myTouch 3G, and Dash 3GPP ("the accused HTC products").

44.     Upon information and belief, the accused HTC products support at least releases 5, 6, and 7 of the 3GPP standard.

45.     Upon information and belief, the accused HTC products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

46.     Upon information and belief, HTC has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '819 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to Aria, HD2, Imagio, Pure, Tilt 2, Touch Cruise, G1, myTouch 3G, and Dash 3G, that fall within the scope of one or more of the claims of the '819 Patent.   HTC contributes to and induces infringement through supplying the accused HTC products to customers, and HTC's customers who purchase the accused HTC products and operate those products in accordance with HTC's instructions directly infringe one or more claims of the '819 Patent.

47.     Upon information and belief, LG makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to Encore GT550, Vu Plus GR700, GU292, Arena GT950, eXpo GW820, Shine II GD710, Xenon GR500, CF360, Vu CU920, Incite CT810, Invision CB630, Shine CU720, and Vu CU915 ("the accused LG products").

48.     Upon information and belief, the accused LG products support at least releases 5, 6, and 7 of the 3GPP standard.

49.     Upon information and belief, the accused LG products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

50.     Upon information and belief, LG has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '819 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to Encore GT550, Vu Plus GR700, GU292, Arena GT950, eXpo GW820, Shine II GD710, Xenon GR500, CF360, Vu CU920, Incite CT810, Invision CB630, Shine CU720, and Vu CU915, that fall within the scope of one or more of the claims of the '819 Patent.  LG contributes to and induces infringement through supplying the accused LG products to customers, and LG's customers who purchase the accused LG products and operate those products in accordance with LG's instructions directly infringe one or more claims of the '819 Patent.

51.     Defendants, by way of their infringing activities, have caused and continue to cause Wi-LAN to suffer damages, and Wi-LAN is entitled to recover from Defendants damages in an amount to be determined at trial.

52.     Wi-LAN has no adequate remedy at law against the Defendants' acts of infringement, and unless the Defendants are enjoined from their infringement of the '819 Patent, Wi-LAN will suffer irreparable harm.

53.     Wi-LAN reserves the right to allege, after discovery, that infringement of the '819 Patent by one or more of the Defendants is willful and deliberate, entitling Wi-LAN to increased damages under 35 U.S.C. § 284 and to attorney's fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT IV:  INFRINGEMENT OF THE '211 PATENT

54.     Upon information and belief, Sony Ericsson makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to Vivaz, Xperia X10, Equinox, W518a, Satio, Xperia X2a, Xperia Pureness, Aino, and Naite.

55.     Upon information and belief, the accused Sony Ericsson products support at least releases 5, 6, and 7 of the 3GPP standard.

56.     Upon information and belief, the accused Sony Ericsson products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

57.     Upon information and belief, Sony Ericsson has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '211 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to Vivaz, Xperia X10, Equinox, W518a, Satio, Xperia X2a, Xperia Pureness, Aino, and Naite, that fall within the scope of one or more of the claims of the '211 Patent.  Sony Ericsson contributes to and induces infringement through supplying the accused Sony Ericsson products to customers, and Sony Ericsson's customers who purchase the accused Sony Ericsson products and operate those products in accordance with Sony Ericsson's instructions directly infringe one or more claims of the '211 Patent.

58.     Upon information and belief, HTC makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to Aria, HD2, Imagio, Pure, Tilt 2, Touch Cruise, G1, myTouch 3G, and Dash 3G.

59.     Upon information and belief, the accused HTC products support at least releases 5, 6, and 7 of the 3GPP standard.

60.     Upon information and belief, the accused HTC products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

61.     Upon information and belief, HTC has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '211 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to Aria, HD2, Imagio, Pure, Tilt 2, Touch Cruise, G1, myTouch 3G, and Dash 3G, that fall within the scope of one or more of the claims of the '211 Patent.   HTC contributes to and induces infringement through supplying the accused HTC products to customers, and HTC's customers who purchase the accused HTC products and operate those products in accordance with HTC's instructions directly infringe one or more claims of the '211 Patent.

62.     Upon information and belief, LG makes, uses, offers for sale, imports, and/or sells products compliant with the 3GPP standard, including but not limited to Encore GT550, Vu Plus GR700, GU292, Arena GT950, eXpo GW820, Shine II GD710, Xenon GR500, CF360, Vu CU920, Incite CT810, Invision CB630, Shine CU720, and Vu CU915.

63.     Upon information and belief, the accused LG products support at least releases 5, 6, and 7 of the 3GPP standard.

64.     Upon information and belief, the accused LG products use orthogonal codes to transmit and/or receive a plurality of data items over a plurality of wireless links in a single frequency channel.

65.     Upon information and belief, LG has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the '211 Patent in this District and elsewhere by making, using, offering for sale, importing, and/or selling, without authority from Wi-LAN, products compliant with the 3GPP standard, including but not limited to Encore GT550, Vu Plus GR700, GU292, Arena GT950, eXpo GW820, Shine II GD710, Xenon GR500, CF360, Vu CU920, Incite CT810, Invision CB630, Shine CU720, and Vu CU915, that fall within the scope of one or more of the claims of the '211 Patent.  LG contributes to and induces infringement through supplying the accused LG products to customers, and LG's customers who purchase the accused LG products and operate those products in accordance with LG's instructions directly infringe one or more claims of the '211 Patent.

66.     Defendants, by way of their infringing activities, have caused and continue to cause Wi-LAN to suffer damages, and Wi-LAN is entitled to recover from Defendants damages in an amount to be determined at trial.

67.     Wi-LAN has no adequate remedy at law against the Defendants' acts of infringement, and unless the Defendants are enjoined from their infringement of the '211 Patent, Wi-LAN will suffer irreparable harm.

68.     Wi-LAN reserves the right to allege, after discovery, that infringement of the '211 Patent by one or more of the Defendants is willful and deliberate, entitling Wi-LAN to increased

damages under 35 U.S.C. § 284 and to attorney's fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Wi-LAN demands a trial by jury for any and all issues triable of right before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Wi-LAN requests entry of judgment in its favor and against Defendants as follows:

A.      Declaring that Defendants have infringed one or more of U.S. Patent No. 6,088,326, U.S. Patent No. 6,195,327, U.S. Patent No. 6,222,819, and U.S. Patent No. 6,381,211;

B.      Permanently enjoining Defendants and their officers, directors, agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and all others acting in concert or privity with any of them from infringing, inducing the infringement of, or contributing to the infringement of one or more of U.S. Patent No. 6,088,326, U.S. Patent No. 6,195,327, U.S. Patent No. 6,222,819, and U.S. Patent No. 6,381,211;

C.      Awarding to Wi-LAN damages arising out of Defendants' infringement of one or more of U.S. Patent No. 6,088,326, U.S. Patent No. 6,195,327, U.S. Patent No. 6,222,819, and U.S. Patent No. 6,381,211, including enhanced damages pursuant to 35 U.S.C. § 284, together with prejudgment and post-judgment interest, in an amount to be determined at trial;

D.      Awarding to Wi-LAN its costs in connection with this action; and

E.      Such other and further relief in law or in equity to which Wi-LAN may be justly entitled.

17

Dated:  October 5, 2010          Respectfully submitted,


By: */s/ David B. Weaver (w/permission Wesley Hill)*

Johnny Ward
Texas State Bar No. 00794818
Email: jw@jwfirm.com
Wesley Hill
Texas State Bar No. 24032294
Email: wh@jwfirm.com
WARD & SMITH LAW FIRM
111 W. Tyler Street
Longview, TX 75601
Tel:  (903) 757-6400
Fax: (903) 757-2323

David B. Weaver – LEAD ATTORNEY
Texas State Bar No. 00798576
David D. Hornberger
Texas State Bar No. 24055686
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX 78746
Tel:  (512) 542-8400
dweaver@velaw.com
dhornberger@velaw.com

Charles P. Ebertin
VINSON & ELKINS LLP
525 University Avenue, Suite 410
Palo Alto, CA 94301-1918
Tel:  (650) 617-8400
cebertin@velaw.com

*Attorneys for Plaintiff, Wi-LAN Inc.*

# Exhibit B

Vinson&Elkins

David B. Weaver  dweaver@velaw.com
Tel 512.542.8651  Fax 512.236.3476

January 19, 2011

Richard L. Wynne, Jr.
Thompson & Knight LLP
112 Routh Street, Suite 1500
Dallas, Texas 75201

**By Email**
**CONFIDENTIAL**

Re:     *Wi-LAN Inc. v. Alcatel-Lucent USA Inc., et al.*, case no. 6:10-cv-521

Dear Mr. Wynne:

I write in response to your letter dated December 29, 2010, in which you continue to assert groundless breach of contract claims.  Wi-LAN takes seriously its rights and obligations under the Patent and Conflict Resolution Agreements ("Agreements") and continues to abide by the terms set forth therein.

I am disappointed by the tone and baseless accusations of your letter.  Wi-LAN filed this lawsuit to protect itself from Ericsson's and Sony Ericsson's continued infringement of Wi-LAN's patent rights.  Specifically, Ericsson and Sony Ericsson are infringing certain of the following four Wi-LAN patents: U.S. Patent Nos. 6,088,326; 6,195,327; 6,222,819; and 6,381,211 (the "Patents-in-Suit").  The Agreements do not prohibit Wi-LAN from enforcing its rights in these patents by filing a patent infringement lawsuit.  While the Agreements do preclude litigation regarding the patents identified by Schedule A to the Agreements, the Patents-in-Suit are not listed in Schedule A.  (Agreements at Art. III, § 1; *id.* at Schedule A.)  The Agreements also specifically note that Wi-LAN may in the future file a lawsuit to enforce patents owned by Wi-LAN but not listed in Schedule A—pursuant to a provision that was specifically sought by your clients during the negotiation of the Agreements.  (*Id.* at Art. IV, § 1.)  Accordingly, I fail to see any basis for your breach of contract counterclaim.  If you wish to maintain this counterclaim, we insist that you promptly identify your basis for alleging that Wi-LAN has breached either of the Agreements.

The complaint in your letter is similarly without basis.  Although you contend that Wi-LAN has breached the Agreements by stating that your clients paid a certain quantum of money, Wi-LAN's reply does not disclose any provision of the Agreements.  As

**Vinson & Elkins LLP  Attorneys at Law**
Abu Dhabi  Austin  Beijing  Dallas  Dubai  Hong Kong  Houston
London  Moscow  New York  Palo Alto  Shanghai  Tokyo  Washington

2801 Via Fortuna, Suite 100
Austin, TX 78746-7568
Tel +1.512.542.8400  Fax +1.512.542.8612  www.velaw.com



acknowledged by your letter, the Agreements prohibit the parties from disclosing the contents of the Agreements themselves. Wi-LAN's truthful statement that your clients paid a particular amount of money, without more, does not breach this confidentiality provision. Moreover, the Agreements allow the parties to disclose the contents of the document to a court. (*Id.* at Art. VIII, § 11.) Your counterclaim allegation that your clients were in full compliance with the Agreements necessitated Wi-LAN's factually accurate response. Finally, your letter fails to identify any alleged damages suffered by your clients due to the factual disclosure of a $100,000 transaction, and your letter fails to provide any proposal to remedy the purported breach. Please explain your grounds for arguing that this disclosure constituted a breach of the agreement. Also, please let me know what, if any, damages your clients have allegedly suffered. As you know, out of an abundance of caution, we have now sealed Wi-LAN's responses to Ericsson's and Sony Ericsson's counterclaims. If you have another proposal to remedy this alleged breach, please let me know immediately.

Furthermore, in addition to being baseless, the complaint in your letter stands in stark contrast to your clients' own conduct. In Ericsson's and Sony Ericsson's counterclaims, your clients alleged that "Plaintiffs' assertions of infringement in its Complaint are a knowing and willful breach of the [Agreements]." (Dkt Nos. 53 & 55 at p. 15 (¶ 5).) However, Wi-LAN's agreement not to file a lawsuit to enforce the patents listed in Schedule A is a significant— and confidential—term of the Agreements. (*See* Agreements at Art. III, § 1; *id.* at Art. VIII, § 11.) Despite the confidentiality requirements, your clients publically disclosed this term in their counterclaims without justification, without Wi-LAN's prior knowledge, and without Wi-LAN's approval or consent. Thus, if you choose to maintain your spurious allegation that Wi-LAN breached the Agreements by merely disclosing a fact necessitated by your clients' counterclaims, please explain how your clients' public disclosure of a term of the Agreements themselves does not constitute a breach of the confidentiality provisions of those Agreements.

I look forward to receiving your response.

Best regards,

David B. Weaver