## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO: 12-cv-23569-MIDDLEBROOKS

WI-LAN USA, INC. and WI-LAN, INC.,

      Plaintiffs,

v.

TELEFONAKTIEBOLAGET TM ERICSSON and ERICSSON INC.,

      Defendants.

_____/

### MARKMAN ORDER

On December 4, 2014, the Court held a claim construction hearing. Based on the Parties' submissions and arguments at the hearing, the Court issues the following claim construction order.

## I.   BACKGROUND.

On October 1, 2012, Plaintiffs Wi-LAN USA, Inc. and Wi-LAN, Inc. (collectively, "Wi-LAN") filed a complaint alleging patent infringement by Defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc. (collectively, "Ericsson"). (DE 1). On February 14, 2013, Ericsson moved for summary judgment, asking the Court to interpret a prior agreement between Wi-LAN and Ericsson, which allegedly limited Wi-LAN's ability to assert certain patents against Ericsson. (DE 118). On June 20, 2013, the Court issued an Order granting Ericsson's motion for summary judgment, finding that, because Ericsson was entitled to, and was willing to accept, a most-favored license pursuant to the Parties' Patent and Conflict Resolution Agreement, the controversy between Wi-LAN and Ericsson was moot. (*See id.* at 9).

On August 1, 2014, the United States Court of Appeals for the Federal Circuit reversed the Court's decision. (DE 157). The Federal Circuit concluded that Ericsson's rights under the most-favored licensee provision were not triggered, and the Court's dismissal of Wi-LAN's infringement suit was improper. (*Id.* at 17). On remand, the Court is tasked to determine whether Ericsson infringes the following patents owned by Wi-LAN: U.S. Patent No. 8,027,298 (the "'298 Patent"); U.S. Patent No. 8,249,014 (the "'014 Patent"); and U.S. Patent 8,229,437 (the "'437 Patent") (collectively, the "Patents"). As part of this endeavor, the Court has been asked to construe various terms contained in the Patents.

### A. The '298 Patent and the '014 Patent.

The '014 Patent is a continuation of the '298 Patent, meaning the Patents share a common specification but have different claims.[1]  The specification describes broadband wireless communication networks, which include base stations and subscriber units. *See, e.g.,* '298 Patent at 1:20-24 (DE 181-1). The Patents describe various types of subscriber units, including cell phones, personal communication systems, cordless telephones, subscriber stations, and customer premises equipment ("CPE"). *Id.* at 1:33-39, 62-65. The base stations serve as conduits that facilitate communications between the subscriber units and the network. *Id.* at 1:36-41. Transmissions from the subscriber unit to the base station are referred to as "uplink," whereas transmissions from the base station to the subscriber unit are referred to as "downlink." *Id.* at 1:49-52.

Because base stations do not have unlimited bandwidth to transmit and receive data, the base stations must allocate the bandwidth among various subscriber units within its coverage area. *Id.* at 2:34-54. This process can be "complex" because subscriber units provide various

---

[1] For convenience, this Order will cite to the '298 Patent specification when describing the background of the '014 and '298 Patents.

types of services, including voice calling, data transmission, and video transmission. *Id.* at 1:59-62. These different services require varying amounts of bandwidth to transmit their data, and the services may also have different quality of service ("QoS") requirements. *Id.* at 2:19-25; 3:37-40.

A base station can periodically poll the subscriber units about their resource needs. *Id.* at 4:1-9. However, if the subscriber units must respond to frequent polls from the base station (regardless of whether the subscriber units actually need resources), the subscriber units will wastefully consume uplink bandwidth. *See id* at 2:34-44; 3:35-52. To address this problem, the '298 and '014 Patents disclose a two-stage process to facilitate efficient communications between the base station and subscriber units. *See, e.g., id.* at 2:48-54; 2:64-66. First, a subscriber unit indicates the need for additional bandwidth by sending an "explicit message" to the base station. *See, e.g., id.* at 4:4-9. Upon detection of the explicit message from the subscriber unit, the base station polls the subscriber unit by granting the subscriber unit a nominal amount of bandwidth. *See id.* Second, the subscriber unit uses this nominal bandwidth to send a request for additional bandwidth, and the base station determines whether or not the request for additional bandwidth can be accommodated. *See, e.g., id.* at 4:49-54.

After the subscriber unit sends a bandwidth request, and the base station grants bandwidth, the subscriber unit determines how to most efficiently use that bandwidth allocation. *Id.* at 4:34-48. The subscriber unit may, therefore, choose to allocate its bandwidth for services different from those considered when it made its bandwidth request because the subscriber unit's needs may have changed since the time it made the request. *Id.*

**B. The '437 Patent.**

The '437 Patent describes an invention that facilitates the maintenance of communications between base stations and wireless devices ("subscriber stations") in a

"handover" context, where a mobile subscriber station transitions from the coverage area of a "serving base station" to the coverage area of a "target base station." '437 Patent at 20: 1-9 (DE 181-3). Specifically, the claimed invention involves a system and method of pre-allocating identification codes to wireless devices for use in requesting resources over a random access channel in a wireless communication system. *See id.* at Abstract. When a mobile subscriber station enters a target base station's coverage area, the target base station provides (via the serving base station) a reserved access code, or random access identifier, that the mobile subscriber station can use for communicating with the target base station on a random access channel. *See id.* at 6:15-26. The reserved access code allows the target base station to uniquely identify the mobile subscriber station. *Id.* at 10:27-39. The reserved access code may also inform the base station of the purpose of the communication (*e.g.*, handover from one base station to another). *Id.* Using a reserved access code for handover helps reduce collisions among mobile subscriber stations transmitting simultaneously, as would occur if two mobile subscriber stations happened to choose the same (non-reserved, random) code for transmission at the same time. *See id.* at 5:59-62.

## II.   LEGAL STANDARD.

Claim construction is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Claim construction analysis begins by looking to the words of the claims. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). The words of the claims are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005). The ordinary and customary meaning of a claim term may be determined solely by

4

viewing the term within the context of the claim's overall language. *See Phillips*, 415 F.3d at 1313 ("[T]he use of a term within the claim provides a firm basis for construing the term."). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *See id.* at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001). The use of the term in other claims may provide guidance regarding its proper construction. *See id.* ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). Claims should be construed "without reference to the accused device." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (emphasis omitted). Once the proper meaning of a term used in a claim has been determined, the term must have the same meaning for all claims in which it appears. *See Phillips*, 415 F.3d at 1314 (citations omitted).

A claim should also be construed in a manner that is consistent with the patent's specification. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."). Typically, the specification is the best guide for construing the claims. *See Phillips*, 415 F.3d at 1315. Precedent forbids, however, a construction of claim terms that imposes limitations not found in the claims or supported by an unambiguous restriction in the specification or prosecution history. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998).

Another tool to supply proper context for claim construction is the prosecution record and any statements made by the patentee to the United States Patent and Trademark Office ("PTO") regarding the scope of the invention. *See Markman*, 52 F.3d at 980. A patent's "prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the

5

prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317 (citation omitted). However, the Federal Circuit has warned that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* However, in order to conclude that a patentee narrowed his claim, the disclaimer must have been with "reasonable clarity and deliberateness." *Superguide Corp. v. Directv Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (quotation marks omitted).

District courts may also consider extrinsic evidence, such as dictionaries or technical treatises, to understand the underlying technology and the manner in which one skilled in the art might use claim terms. *See Phillips*, 415 F.3d at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Ultimately, however, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language," and a court should discount any extrinsic evidence "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Id.* at 1317-18 (quotation marks omitted).

## III.  DISCUSSION.

### A.  Terms in the '298 and '014 Patents.

i.   "bandwidth"

| Wi-LAN's Proposed Construction | Ericsson's Proposed Construction | Claims |
|---|---|---|
| data transmission resources | data transmission resources in a particular time period | '298 Patent claims 1, 2, 4<br><br>'014 Patent claims 1, 4, 6 |

The Parties dispute the construction of the term "bandwidth" that appears in all asserted claims of the '298 and '014 Patents. The only disagreement regarding this term is whether the phrase "in a particular time period" should be appended to the construction "data transmission resources." (DE 180 at 6). Ericsson asserts that bandwidth is defined in the context of time throughout the Patents. (DE 186 at 10-11). For example, Figure 2 represents bandwidth in the form of a sub-frame that is divided into time slots. '298 Patent at Fig. 2. The top of the figure states that the duration of the sub-frame is one millisecond. *Id.* at 7:34-38. In addition, Ericsson notes that the base station's grant of bandwidth to mobile device is also defined in terms of these physical time slots. *Id.* at 7:42-43. Ericsson further supports its proposed construction with extrinsic evidence, in the form of technical dictionaries. (DE 186 at 12-13).

Wi-LAN argues that the term "bandwidth," as used in the Patents, does not include a time component. (DE 80 at 6). According to Wi-LAN, "[t]he '298 and '014 Patents treat bandwidth as resources needed to transfer a quantity of data, not as the speed at which the transfer occurs." (*Id.* at 6-7). Wi-LAN agrees that bandwidth is indeed allocated within a time period, and the amount of bandwidth in a time period can affect the speed of transfer. (*Id.* at 7). Wi-LAN does not, however, agree that the bandwidth itself is limited to data transmission resources in a particular time period. (*Id.*).

Rather, Wi-LAN contends that the intrinsic evidence indicates that the '298 and '014 Patents define bandwidth by its quantity. (*Id.* at 7-9). For example, Wi-LAN notes that Claim 1

7

requires a "requested amount of UL bandwidth pertaining to a UL queue established at the subscriber unit," and requires allocating a bandwidth grant "based on the requested amount and the bandwidth available for UL data." (*Id.* at 7) (citing '298 Patent at 23:19-20; 23:24-25). Wi-LAN contends this language "reflects that both the subscriber unit and the base station treat bandwidth allocations in reference to quantities of data: how much the subscriber unit needs to send; and how much the base station can let the subscriber unit send." (*Id.*). Thus, Wi-LAN maintains that "while bandwidth requirements vary over time, bandwidth itself refers to a quantum of data that can be sent."[2] (*Id.* at 8).

Both Parties agree that "bandwidth" is a resource over which data is transmitted between the subscriber unit and the base station. (DE 180 at 6-7); (DE 186 at 10). "In the claims, bandwidth is [being] requested by subscriber units, measured for its availability by the base station, and allocated for distribution (based on demand and availability) to connections established at the subscriber unit." *See Wi-LAN, Inc. et al. v. Alcatel-Lucent USA, Inc.*, No. 12-cv-23568, 2013 WL 4811233, at *12 (S.D. Fla. 2013) (citing '298 Patent, Claim 1 at 23:10-29; '014 Patent, Claim 2 at 23:29-31). However, the amount of data that can be transmitted is inherently connected to the availability of the "resource" at a given point in time. As Judge Altonaga observed, "if bandwidth was an ambiguous 'data transmission resource' that was always available in unlimited amounts, there would be little need for the patented invention." *Id.* Accordingly, the Court accepts Ericsson's proposed construction based on Judge Altonaga's prior holding that "bandwidth" is to be construed as "data transmission resources in a particular time period."

### ii.  "an UL bandwidth grant"/"the granted amount of UL bandwidth"

---

[2] Wi-LAN also supports its position with extrinsic evidence in the form of expert testimony from Dr. Paul S. Min (Min Del. at ¶ 33).

| Wi-LAN's Proposed Construction | Ericsson's Proposed Construction | Claims |
|---|---|---|
| resources assigned for uplink data transmission | implicit indication of an allocation | '298 Patent claims 1, 2, 4<br><br>'014 Patent claims 1, 4, 6 |

The terms "an UL bandwidth grant" and "the granted amount of UL bandwidth" appear in all asserted claims.[3]  For context, the disputed term appears in Claim 1 of the '298 Patent as follows:

> allocate to the subscriber unit **an UL bandwidth grant** based on the requested amount and the bandwidth available for UL data, where the **UL bandwidth grant** is allocated to the subscriber unit for distribution, without any control from the base station, between the connections established at the subscriber unit.

'298 Patent, Claim 1.  Wi-LAN argues that its construction "accurately reflects that a bandwidth grant simply refers to the bandwidth that is allocated in response to a request for bandwidth." (DE 180 at 12).

Ericsson disagrees and contends that the applicants for the '298 and '014 Patents "expressly disclaimed any explicit allocation of uplink bandwidth by the base station to the subscriber unit." (DE 186 at 15).  Ericsson notes "[d]isclaiming the ordinary meaning of a claim term – and thus, in effect, redefining it – can be affected through 'repeated and definitive remarks in the written description.'"  (DE 186 at 17) (citing *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1196 (Fed. Cir. 2013) (quoting *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008)).  Ericsson asserts the inventors' various references to implicit allocations of bandwidth demonstrate the allocation or grant must be implicit.  (DE 186 at 15-19) (citing '298 Patent 10:2-4; 4:17-21; 13:12-15; 22:36-41).

---

[3] "UL" means "uplink."  *See* '298 Patent at 23:17.

Indeed, a "patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971, 976 (Fed. Cir. 2013) (citations omitted). However, "[t]o constitute disclaimer, there must be a clear and unmistakable disclaimer . . . [and] [i]t is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation." *Id.* Here, contrary to Ericsson's arguments, there is no evidence in the Patents of a "clear and unmistakable disclaimer" of explicit bandwidth grants.

As Wi-LAN explains, an "indication of a grant or allocation is not the same thing as the grant or allocation itself," and Ericsson is seeking a requirement that the processes of "'indicating' a bandwidth grant [] be performed implicitly." (DE 194 at 4) (citing DE 186 at 18). Ericsson's construction is improper because the specification does not discuss an implicit *grant* of bandwidth; rather, it discloses that the *communication of the grant* may be implicit. *See* '298 Patent at 13:12-14 ("[T]he bandwidth request will be granted and this will be implicitly communicated to the CPE MAC."); *see also* '298 Patent at 22:39-40. In fact, if the term "grant" is replaced with "implicit indication of an allocation" as Ericsson proposes, then Claim 20 of the '298 Patent, for example, would read: "wherein the base station implicitly informs the subscriber unit . . . by allocating to said subscriber unit the **implicit indication of an allocation**." Such a construction is simply incomprehensible. For these reasons, the Court adopts Wi-LAN's construction, and construes "an UL bandwidth grant" / "the granted amount of UL bandwidth" as "resources assigned for uplink data transmission."

   **iii.   "uplink (UL) queue"**

| Wi-LAN's Proposed Construction | Ericsson's Proposed Construction | Claims |
|---|---|---|
| a connection of uplink data with quality of service (QoS) requirements | a structure containing data to be transmitted relating to a particular quality of service level | '298 Patent claims 1, 2, 4

'014 Patent claim 6 |

The term "uplink (UL) queue" is found in Claims 1, 2, and 4 of the '298 Patent and in Claim 6 of the '014 Patent. Based on their proposed constructions, the Parties agree that a subscriber unit's "uplink queue" relates to quality of service. However, the Parties appear to have two disputes with regard to this term: (1) whether a queue is a structure containing data, or just the data itself; and (2) whether a queue relates to a single quality of service ("QoS") or multiple QoSs. (DE 186 at 20).

As to the first issue, Judge Altonaga construed the term "uplink (UL) queue" as "a *structure* containing data to be transmitted relating to a particular quality of service level." *See Wi-LAN*, 2013 WL 4811233 at *23 (emphasis added). Indeed, Judge Altonaga expressly rejected Wi-LAN's same proposed construction in the *Alcatel-Lucent* case. *See id.* Contrary to Wi-LAN's proposal, there is no support in the specification that equates "UL queue" with the data that it holds. *See id.* at *22-23. Accordingly, the Court agrees with Judge Altonaga that an uplink queue is not "a collection of uplink data," as proposed by Wi-LAN, but rather is a "structure containing data" as proposed by Ericsson.

The second issue is whether each "UL queue" relates to a particular quality of service, as Ericsson proposes, or if the queue can consist of multiple quality of service levels, as Wi-LAN proposes. Wi-LAN argues that the "claims themselves do not include any requirement that queues be limited to a single quality of service level." (DE 180 at 14). One of the only claims to mention quality of service, dependent Claim 13 of the '298 Patent, claims "each queue for accumulating DL data received for connections with a similar quality of service (QoS) which is

11

ready to be transmitted to the subscriber unit." '298 Patent at 24:43-45. Wi-LAN maintains that this language reflects "at a minimum that a queue can include data with similar quality of service, rather than only one quality of service." (DE 180 at 14).

Ericsson disagrees, and asserts that each "UL queue" has only one "particular quality of service level" associated with it. (DE 186 at 20). Judge Altonaga agreed that "the patented invention employs different "quality of service levels" and adopted Alcatel-Lucent's proposed construction, which is identical to Ericsson's. Judge Altonaga noted that with respect to the downlink bandwidth, "the specification describes how the base station media access control 'maintains a set of queues for each physical channel that it serves' and '[w]ithin each physical channel queue set, the base station maintains *a queue for each QoS*.'" *Wi-LAN*, 2013 WL 4811233 at *21 (citing '298 Patent 18:45-49 (emphasis added)). The accompanying Figure 12, which "shows the downlink bandwidth allocation method used by the present invention" also separates the queues by quality of services requirements by labeling the queues as "QoS1," "QoS2," . . . and "QoSn." '298 Patent at Fig. 12. The Patents treat uplink queues in a similar fashion. Figure 13, which "shows the uplink bandwidth allocation method used by the present invention," also separates the queues by quality of service requirements. *Id.* at Fig. 13. Further, Judge Altonaga observed that when there is insufficient bandwidth to transmit all queued data, "a QoS specific fairness algorithm is initiated to ensure fair handling of the data *queued at that QoS*." *Wi-LAN*, 2013 WL 4811233 at *21 (citing '298 Patent at 19:51-54) (emphasis added)).

Judge Altonaga's survey of the intrinsic record supports Ericsson's proposed construction. *See id.* at *21-24. While Wi-LAN attempts to side-step Judge Altonaga's prior construction, its arguments regarding Claim 13 of the '298 Patent are unpersuasive. Claim 13 simply associates a downlink queue with a connection. '298 Patent at 24:41-45. Accordingly, the Court declines to adopt Wi-LAN's proposed construction, and construes "uplink (UL)

queue" to mean "a structure containing data to be transmitted relating to a particular quality of service level."

    iv. "connection(s)"[4]

| Wi-LAN's Proposed Construction | Ericsson's Proposed Construction | Claims |
|---|---|---|
| Connection(s) for services, and other information, needing bandwidth between the subscriber unit and the base station | Communication link to a service | '298 Patent claims 1, 2, 4<br><br>'014 Patent claims 1, 4, 6 |

The term "connection(s)" appears in all asserted claims of the '298 and '014 Patents. After reviewing the proposed constructions, Wi-LAN's proposal appears problematic for several reasons. First, Wi-LAN's proposed construction simply describes the term "connection(s)," rather than define it. Wi-LAN's use of the term "connection(s)" in its definition renders the proposed construction circular. That is, the reader is presumed to know the definition of "connection(s)," despite the fact that "connection(s)" is the very term being defined.

Wi-LAN's proposed construction, when read in context, is also repetitive. For example, Claim 1 of the '298 Patent states, "wherein the UL bandwidth grant is allocated to the subscriber unit for distribution, without any control from the base station, between the **connections** established at the subscriber unit." '298 Patent, Claim 1 (emphasis added). When importing Wi-LAN's proposed construction, Claim 1 reads, "wherein the UL bandwidth grant is allocated to the subscriber unit for distribution, without any control from the base station, between the **connections for services, and other information, needing bandwidth between the subscriber**

---

[4] The Parties had originally proposed and briefed different constructions than the ones discussed in this Order. At the *Markman* hearing, it became apparent that the originally proposed constructions did not adequately explain the term "connection(s)," and the Court suggested the Parties submit alternative proposals. The Parties submitted a Joint Statement Regarding Construction of "Connection(s)" (DE 201) on December 8, 2014. Because the Parties did not brief arguments relating to their newly proposed constructions, the Court relies on the arguments set forth at the *Markman* hearing. (*See* DE 207).

**unit and the base station** established at the subscriber unit." Finally, it is not clear the Patents support the importation of "other information" into the definition of "connection(s)." The Court, therefore, declines to adopt Wi-LAN's proposed construction.

Ericsson's proposal, on the other hand, better captures the definition of "connection(s)" as contemplated by the Patents. The claims instruct that the "connection" is "established at" the subscriber unit. '298 Patent at Claim 1; '014 Patent at Claim 1, Claim 6. Further, the specification explains that once bandwidth is allocated to a subscriber unit, the subscriber unit is responsible for distributing the allocated bandwidth across the data services, or "connections," provided by the subscriber unit. *See, e.g.*, '298 Patent at 19:26-31; 22:3-8; 22:50-54. The Patents do not specifically define "services," but explain that "services" refer to "enhanced broadband services such as voice, data and video services" provided for on the subscriber unit. *Id.* at 1:59-62; *see also id.* at 2:14-33. Because Ericsson's proposed construction is supported by the intrinsic record, the Court construes "connection(s)" as a "communication link(s) to (a) service(s)."

**v.   "control"**

| Wi-LAN's Proposed Construction | Ericsson's Proposed Construction | Claims |
|---|---|---|
| decision-making power | direction, regulation or influence [5] | '298 Patent claims 1, 2, 4 |

The term "control" is found in Claims 1, 2, and 4 of the '298 Patent. Claim 1 is exemplary of the use of '298 Patent's use of the term "control," providing that a bandwidth grant is allocated to the subscriber unit "for distribution, without any control from the base station, between the connections established at the subscriber unit." '298 Patent, Claim 1. Wi-LAN

---

[5] Ericsson previously proposed "to direct, regulate or influence," (DE 174-1), but subsequently changed their proposed construction to "direction, regulation or influence" in their Responsive Claim Construction Brief. (DE 186 at 25).

proposes that "control" be construed to mean that after the base station informs the subscriber unit of the bandwidth grant, distribution of the bandwidth grant between connections established at the subscriber unit occurs "without the base station exercising decision-making power." (DE 180 at 19). Ericsson agrees that the subscriber unit may use the allocated bandwidth in any manner it chooses, "without any control from the base station." (DE 186 at 25) (citing '298 Patent at col. 1). However, Ericsson proposes construing "control" as "direction or regulation."[6] (*Id.* at 26) (citing Webster's New Collegiate Dictionary 247 (8th ed. 1977) (defining "control" as "to exercise restraining or directing influence over: REGULATE")).

Having considered the submissions and arguments, it appears the Parties are simply arguing over synonyms for the word "control." The specification makes clear that the subscriber unit, *not* the base station, is responsible for how the subscriber unit uses the allocated bandwidth. For example, the specification notes that the "CPE[7] is free to use the uplink bandwidth that was allocated to it in a manner that is different than that originally requested or granted by the base station." '298 Patent 4:34-46; *see also, id.* at 10:60-11:3. Further, the specification explains that, "[o]nce a CPE is allocated bandwidth by the base station, the CPE, *not the base station*, is responsible for using the uplink bandwidth in a manner that can accommodate the services provided by the CPE." *Id.* at 10:41-46 (emphasis added). The specification is, therefore, clear and provides adequate explanation for a person of ordinary skill in the art to understand the meaning of "control." Because the Court will not construe a claim when the meaning or scope of the words is clear, the Court finds that no construction is necessary. *See Phillips*, 415 F.3d at 1315.

---

[6] In its Responsive Claim Construction Brief (DE 186), Ericsson states that it "does not object to 'direction or regulation' as the construction for 'control,' although it maintains that 'influence' is appropriate as well." (DE 186 at 26).

[7] "CPE" is defined by the Patents as "Customer Premises Equipment." '298 Patent at 2:6-7.

### vi.   "explicit message received from [a/the] subscriber unit"

| Wi-LAN's Proposed Construction | Ericsson's Proposed Construction | Claims |
|---|---|---|
| an alert from a subscriber unit indicating to the base station that the subscriber unit needs to be polled specifically for the purpose of making a bandwidth request | an alert from a subscriber unit indicating to the base station that the subscriber unit needs to make a bandwidth request | '298 Patent claim 2<br><br>'014 Patent claim 6 |

The disputed term appears in Claim 2 of the '298 Patent and Claim 6 of the '014 Patent. These claims, with the disputed phrase in bold, appear as follows:

'298 Patent, Claim 2: A base station as claimed in claim 1, wherein upon identification of an **explicit message received from the subscriber unit**, the base station responds by providing the subscriber unit with an allocation of UL bandwidth for enabling the subscriber unit to transmit the bandwidth request to the base station.

'014 Patent, Claim 6: A method of allocating bandwidth to subscriber units from a base station operating in a wireless communication system comprising:

identifying an **explicit message received from a subscriber unit** requesting an allocation of uplink (UL) bandwidth in which to transmit a bandwidth request;

Wi-LAN's proposed construction for "explicit message . . ." is "an alert from a subscriber unit indicating to the base station that the subscriber unit needs to be polled specifically for the purpose of making a bandwidth request." (DE 180 at 20). Ericsson's proposal is essentially the same, except it does not require that the subscriber unit alert the base station that it "needs to be polled" in order to make a bandwidth request. (DE 186 at 27).

In support of its construction, Wi-LAN cites to portions of the specification that explain how the base station allocates bandwidth to selected CPEs specifically for the purpose of making bandwidth requests. (DE 180 at 21) (citing '298 Patent at 9:51-52). Wi-LAN also cites to the prosecution history of the parent application to the '014 Patent, where the examiner described an "explicit message" as an "alert[]/message[]' [to] the network that it wants to request bandwidth

16

(or a change to its current bandwidth)" that could be understood to mean something "similar to 'PLEASE POLL ME.'" (*Id.*) (citing File History of U.S. App. No. 12/645,937). Wi-LAN also notes that its proposed construction was previously adopted by Judge Altonaga. (*Id.*). As explained by Judge Altonaga:

> The specification discloses that an active CPE in need of bandwidth relays an explicit message to the base station only after the CPE has exhausted the piggybacking technique, and thus has no previously allocated bandwidth on which to make or tack on its bandwidth request. (*See* '298 patent, col. 17, ll. 38-56; *id.* at col. 4, ll. 22-33; *id.* at Fig. 9). With no other means of communicating its request, the CPE "sets a 'poll-me' bit or a 'priority poll-me' in a MAC packet in order to indicate to the base station that it requires a change in bandwidth allocation." (*Id.* at col. 17, ll. 19-21). "Active CPEs that do not set their respective 'poll-me' bits in the MAC packet header will not be polled individually." (*Id.* at col. 12, ll. 33-35). The "poll-me bits," or the "explicit messages," thus act as a flag, or an alert, set by the CPE to stimulate a response (polling) from the base station. Wi-LAN's proposed construction accurately reflects the process described in the specification of the '298 and '014 patents.

*Wi-LAN*, 2013 WL 4811233 at *19.

Ericsson fails to make any substantive arguments rebutting Judge Altonaga's reasoning, or attacking Wi-LAN's arguments in its Opening Brief. (*See* DE 186 at 27). Accordingly, the Court construes "explicit message received from [a/the] subscriber unit" as "an alert from a subscriber unit indicating to the base station that the subscriber unit needs to be polled specifically for the purpose of making a bandwidth request."

### vii.   "UL map"

| Wi-LAN's Proposed Construction | Ericsson's Proposed Construction | Claims |
|---|---|---|
| "map": data structure containing a modulation scheme | a persistent data structure containing uplink bandwidth allocations for a plurality of subscriber units | '014 Patent claims 1, 4 |

The disputed term "UL map" is found in claims 1 and 4 of the '014 Patent. For context, Claim 1 of the '014 Patent claims:

A base station for a broadband wireless communication system, comprising:

a transmitter system for transmitting downlink (DL) traffic to a plurality of subscriber units and a receiver for receiving uplink (UL) traffic from the plurality of subscriber units; and

one or more processors having a media access control (MAC) module configured to . . .

maintain an **UL map** with uplink bandwidth allocations,

dynamically update the **UL map** to account for granted mount of UL bandwidth,

provide the updated **UL map** to the transmitter system for transmitting to plurality of subscriber units . . .

'014 Patent, Claim 1.  The Parties agree that the "UL map" is a "data structure," but their constructions diverge thereafter.[8]  Wi-LAN argues that its construction is proper because it "reflects the disclosed mechanism of including bandwidth allocations in an uplink map." (DE 180 at 23).  Specifically, Wi-LAN argues that the specification explains that bandwidth allocations are made "in the form of bandwidth allocation increases in the transmitted map describing the uplink sub-frame." (*Id.*) (citing '014 Patent at 12:11-13).  Further, the specification states that, "[t]he CPE scheduled data is ordered within the uplink sub-frame based upon the modulation scheme used by the CPEs." '014 Patent at 9:18-20; *see also*, 8:60-65.  Accordingly, Wi-LAN asserts that its construction is proper by including that the UL map contains a modulation scheme. (DE 180 at 23).

However, as Judge Altonaga observed, "nothing in the specification indicates that the UL/DL maps themselves employ any sort of modulation scheme." *Wi-LAN*, 2013 WL 4811233 at *33.  Ericsson explains that a "modulation scheme describes how to organize data over the resource itself." (DE 186 at 29).  For example, a modulation scheme can be found at Figure 4.  *See* '298 Patent, Fig. 4.  Figure 4 embodies a sub-frame that contains the physical slots allocated

---

[8] Judge Altonaga previously adopted a third construction, "a persistent set of uplink/downlink bandwidth allocation," *Wi-LAN*, 2013 WL 4811233 at *33, not proposed by either party in the present case.

for uplink transmissions. *Id.* at 5:22-24; 8:41-57. It does not represent that the map keeps track of the allocations. In fact, Wi-LAN's own citations of the '014 Patent specify that "[t]he CPE scheduled data is ordered within the uplink sub-frame 400 based upon the modulation scheme *used* by the CPEs." '014 Patent, 9:18-20 (emphasis added). This reference does not refer to an uplink map, and merely notes that a mobile device (CPE) uses a modulation scheme. Accordingly, there is little support for the proposition that the UL map contains or is comprised of modulation schemes, and the Court, therefore, declines to adopt Wi-LAN's proposed construction.

Ericsson proposes that "UL map" be construed to mean "a persistent data structure containing uplink bandwidth allocations for a plurality of subscriber units." (DE 186 at 27). Wi-LAN first argues that Ericsson's proposal cannot be correct because of its use of the term "persistent." (DE 180 at 23). Specifically, Wi-LAN notes that the specification asserts that "the bandwidth allocations are in a constant state of change owing to the dynamic nature of bandwidth requirements." (*Id.*) (citing '298 Patent at 19:31-33). Wi-LAN asserts that because the map must be updated "dynamically," the use of the word "persistent" in Ericsson's construction is incorrect.

Ericsson disagrees, arguing that the Patents' claim language requires that the base station "maintain an UL map." (DE 186 at 27) (citing '014 Patent at 23:21; '298 Patent at 8:9-11). Ericsson argues that it is impossible to "maintain" something that is not in some way "persistent." (*Id.*). For this reason, Judge Altonaga concluded that the "UL map" must be a "persistent" data structure in the base station. *Wi-LAN*, 2013 WL 4811233 at *33. The Court agrees. In accordance with the claim language, the base station must "maintain" a UL map that can be transmitted to the subscriber units. '014 Patent at 23:21, 24:5. As Judge Altonaga concluded, "use of the term 'persistent' merely reflects the point that these maps are not

19

ephemeral." *Wi-LAN*, 2013 WL 4811233 at *33.   The term is not inconsistent with the requirement that the maps also be "dynamically update[d]" to account for bandwidth allocations. *Wi-LAN*, 2013 WL 4811233 at *33 (citing '014 Patent at 23:22-23).   Accordingly, the first portion of Ericsson's construction, defining a "UL map" as a "persistent data structure," appears to be correct.

The remainder of Ericsson's proposal, however, is not proper.   First, the remaining portions of Ericsson's construction renders certain claims redundant.   For example, Claim 1 of the '014 Patent requires that the base station "maintain an **UL map** with uplink bandwidth allocations." '014 Patent, Claim 1 (emphasis added).   If the Court were to import the term "uplink bandwidth allocations," Claim 1 would read, in part, "maintain a[] **persistent data structure containing uplink bandwidth allocations** with bandwidth allocations."   Such a reading is confusing, redundant, and unnecessary.   Additionally, Ericsson fails to cite support for the addition of the term "for a plurality of subscriber units."   For these reasons, the Court construes "UL map" as a "persistent data structure."

**B.   Terms in the '437 Patent.**

     **i.   "random access identifier"**

| Wi-LAN's Proposed Construction | Ericsson's Proposed Construction | Claims |
|---|---|---|
| reserved access code for use on a random access channel | preallocated code that is not required to wait until a designated slot time to be transmitted, and does not need to be decapsulated before it can be recovered | '437 Claims 8, 18 |

The term "random access identifier" appears in Claims 8 and 18 of the '437 Patent.   For context, Claim 8 of the '437 Patent reads:

     A target base station comprising:

a processor configured to allocate a **random access identifier** uniquely identifying a mobile station in a coverage area of the target base station in association with a handover of an existing communication link;

a receiver configured to receive the allocated **random access identifier** from the mobile station over a random access channel;

the processor further configured to generate, based on the reception of the **random access identifier** by the receiver, a feedback message comprising a timing adjustment . . .

'437 Patent, Claim 8.  Based on the proposed constructions, the Parties appear to have three main disputes with respect to the construction of "random access identifier": (1) whether a random access identifier must be pre-allocated (Ericsson) or merely reserved (Wi-LAN); (2) whether the applicants disclaimed all codes whose transmission depends in any way on time (Ericsson); and (3) whether the applicants disclaimed all codes that must be decapsulated (Ericsson).

Wi-LAN first takes issue with Ericsson's use of the term "pre-allocated."  (DE 180 at 24).  Wi-LAN contends that the term "pre-allocated" "introduces redundancy and possible confusion because the claims already require that the 'random access identifier' be allocated by the target station before it can be used by the mobile station to facilitate handover." (*Id.*) (citing Claim 8, Claim 18).  Wi-LAN contends that use of the term "reserved" is more proper because the specification states that the claimed codes are "reserved for [the claimed] pre-allocation, and that the reserved codes are not to be randomly selected for a random access channel request . . . ." (*Id.*) (citing '437 Patent at 12:43-49).

However, when asked to construe this very term in the *Acatel-Lucent* case, Judge Altonaga rejected Wi-LAN's argument that "reserved" rather than "preallocated" is the correct meaning of "random access identifier." [9]  *Wi-LAN*, 2013 WL 4811233 at *36.  Judge Altonaga correctly noted that the '437 Patent itself is titled, "Pre-Allocated Random Access Identifiers,"

---

[9] Judge Altonaga construed "random access identifier" as a "pre-allocated code for use on a random access channel." *Wi-LAN*, 2013 WL 4811233 at *36.

and the term "pre-allocated" is used in association with the description of this code throughout the specification. *See id.* at *35. Judge Altonaga also detailed the reasons why use of the term "reserved" is not proper in construing "random access identifier." *See id.* at *35-36. For example, Judge Altonaga observed that "[w]hile the specification supports the idea that amongst its universe of codes a base station may 'reserve,' or set aside, a certain number for pre-allocation as random access identifiers, it does not specifically support a construction that the codes used as random access identifiers themselves are 'reserved' in some manner." *Id.* at *36. In accordance with the reasons set forth by Judge Altonaga, the Court agrees that "rather than clarify the meaning of random access identifier, the use of the term 'reserved' tends to promote confusion." *Id.*

Second, Wi-LAN argues that Ericsson's limitation that the code is "not required to wait until a designated slot time to be transmitted" is inconsistent with the disclosure of the specification. (DE 180 at 25). Specifically, Wi-LAN argues that the specification demonstrates that the claimed invention works in a framework of designated "transmission timing requirements." (*See id.* at 25-26) (citing '437 Patent at 4:58-66; 5:4-7; 16:39-42; 2:3-7; 9:44-49). Ericsson, however, argues that in order to overcome the prior art, the applicant "disclaimed identifiers that must wait for a designated slot time." (DE 186 at 30).

During prosecution, the examiner initially rejected as obvious now-issued Claims 8 and 18 over U.S. Pub. Nos. 2008/0013489 ("Anigstein") and 2008/0019320 ("Phan"). Ericsson notes that to overcome the examiner's rejection in light of Anigstein, the applicant distinguished Anigstein's disclosure from the applicant's "random access identifier," stating:

> Applicants vigorously contest the assertion and submit that Anigstein's use of a time-slot in a dedicated channel to receive information at a base station simply cannot be said to amount to the claimed "receiving . . . the allocated random access identifier from the mobile station over a random access channel" where the

> "random access identifier . . . uniquely identifies the mobile station in a coverage area of the target base station."
>
> It should be noted that Applicants' random access identifier can be transmitted by the mobile station and received by the target base station in any instance of the random access channel, but the arrangement in Anigstein requires waiting until a designated slot time to transmit information on the dedicated time-slot.

(DE 186 at 31) (citing File History of U.S. App. No. 13/180,135, Applicants' March 8, 2012, reply at 437FH00110-113). From these statements, Ericsson asserts that "the applicant made clear that, unlike Anigstein, which required that the mobile device wait for a particular time slot to transmit its identifier to the target base station, the invention expressly provided that that transmission could take place at any time." (*Id.* at 32). Thus, Ericsson argues, the applicant's arguments to overcome Anigstein "unequivocally and unambiguously" surrendered any "random access identifier" that must be sent at a designated slot time. (*Id.*).

Wi-LAN disagrees, and argues that the applicants stated that the "key distinction over Anigstein was the reference's use of a contention-free slot in a dedicated access channel for handoff, which is distinct from the shared random access channel in the claimed invention." (DE 180 at 26) (citing File History of U.S. App. No. 13/180,135, Applicants' March 8, 2012, reply at 437FH00110). Accordingly, Wi-LAN argues that the "applicants only distinguished dedicated time slots in the context of a dedicated channel, which is not what the applicants claimed." (*Id.*).

"[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) (internal citation omitted). "To balance the importance of public notice and the right of patentees to seek broad patent coverage, we have [thus] consistently rejected prosecution statements too vague or ambiguous to qualify as disavowal of claim scope." *Id.* Having considered the relevant intrinsic

evidence, it is not apparent that the applicants made a "clear and unmistakable" disavowal of codes whose transmission depends in any way on time.

During prosecution, the applicants argued that the key distinction between the named invention and Anigstein was Anigtein's use of a contention-free slot in a dedicated access channel for handoff, which is distinct from the claimed invention's use of a shared random access channel. *See, e.g.*, 2012-03-08 Applicants' Responses at 13, 437FH0110. For example, the applicants argued "Anigstein['s] use of a time-slot *in a dedicated channel* to receive information at a base station simply cannot be said to amount to the claimed 'receiving . . . the allocated random access identifier from the mobile station over a random access channel' where the 'random access identifier . . . uniquely identifies the mobile station in a coverage area of the target base station." *Id.* (emphasis added). Further, the applicants acknowledged that,

> [i]n Anigstein, although a contention-based random access channel (RACh) is described for initialization, the channel is not used in connection with handoff. Quite the contrary, Anigstein teaches instead a contention-free slot in a dedicated access channel (PA) for handoff. Anigstein can be said to teach away from the use of a shared random access channel.

(DE 182-16) (437FH00110).   The prosecution history, therefore, suggests the applicants sought to distinguish Anigstein's use of dedicated time slots in the context of a dedicated channel, which is not what the applicants had claimed.[10]

---

[10] Further, when considering whether a statement in the prosecution history is a clear disavowal, contradictory evidence such as the plain language of the claims may serve to limit the disclaimer. *See, e.g., Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1372 (Fed. Cir. 2002). Here, the Court agrees that Ericsson's proposed construction is contrary to numerous disclosures of timing requirements in the specification. For example, the specification notes that random access channels only exist at certain designated times. *See* '437 Patent at 2:3-7; 5:4-7; 16:39-42. Additionally, the specification shows that random access identifiers can only be used during the time after they have been allocated and before they have been released. *See id.* at 6:29-33; 8:15-17; 8:31-34. The '437 Patent contemplates various timing requirements, and the second portion of Ericsson's proposal is therefore improper.

Finally, the Parties dispute whether the "random access identifier" must be "decapsulated" before it can be recovered. Ericsson argues that, in distinguishing Phan, the applicants disclaimed any message that needs to be decapuslated. (DE 186 at 34). During prosecution, the applicants made the following argument to distinguish Phan's identifier from its own "random access identifier":

> Applicants further emphatically note that Phan's C-RNTI does not amount to Applicants' claimed "random access identifier" since the message containing the CRNTI must be decapsulated before the identifier can be recovered. In stark contrast, the claimed "random access identifier" allows identification of the mobile station upon receipt thereof by the target base station.

(*Id.*) (citing 437FH00112-114). Based on these statements, Ericsson argues that the applicants, to overcome Phan, distinguished the claimed "random access identifier" from an identifier that must be decapsulated before it can be recovered. (*Id.*). As a result, Ericsson argues the "random access identifier" must be construed as a "preallocated code that . . . does not need to be decapsulated before it can be recovered." (*Id.*).

Wi-LAN argues that "Ericsson takes the applicants' statements about the Phan reference out of context, implying that a narrow basis of distinction was actually a global disclaimer of any message that needs to be decapsulated." (DE 180 at 27). To distinguish Phan, Wi-LAN argues that the applicants argued that Phan's network identifier was not the claimed "random access identifier" for several reasons – namely, that the identifier in Phan is not used for synchronization as required by the claims. (*See id.*) (citing 437FH, Applicants' March 8, 2012, reply at 437FH00113-114). The Court agrees.

As Wi-LAN notes, the cited portion by Ericsson does not disclaim all possible instances of decapsulation, but rather "distinguishes a specific reference that lacks any disclosure of how to use the encapsulated message for the claimed purpose of identifying the mobile station upon receipt thereof by the target base station prior to the synchronization stage." (*Id.*). Because the

25

applicants' statement can be understood more narrowly to distinguish a prior art feature that did not work for the claimed purpose, Ericsson has not shown an unambiguous disclaimer of use of any message that needs to be decapsulated. *See Omega*, 334 F.3d at 1324 (no prosecution disclaimer "where the alleged disavowal of claim scope is ambiguous."). Based on the foregoing, the Court construes "random access identifier" as "pre-allocated code for use on a random access channel."

In conclusion, it is hereby

**ORDERED AND ADJUDGED** that the disputed terms shall have the constructions set forth herein.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this _13_ day of January, 2015.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record